R. J. Reynolds Tobacco Company v. Commissioner.
R. J. Reynolds Tobacco Co. v. Commissioner
Docket No. 45432.
United States Tax Court
T.C. Memo 1956-161; 1956 Tax Ct. Memo LEXIS 132; 15 T.C.M. (CCH) 810; T.C.M. (RIA) 56161; June 6, 1956
*132 During 1949 and 1950 petitioner made distributions under its by-law providing therefor to the extent of a certain percentage of annual profits over a specified base. The distributions were made to certain of its employees and to several employees of its wholly-owned subsidiary entitled to participate on the basis of and in proportion to their respective holdings of petitioner's A stock. Respondent disallowed deduction therefor on the ground that such distributions were in reality preferential dividends. Held, that the distributions to petitioner's own employees were made in accordance with an incentive-compensation plan, and to the extent found to be reasonable in amount, in accordance with a formula determined by the Court, such payments constituted additional compensation and were deductible. Held further, that no portion of the distributions in excess of amounts found to be reasonable additional compensation are deductible as either ordinary and necessary business expenses or as a part of petitioner's cost of goods sold. And held further, that the amounts distributed under the by-law to employees of petitioner's wholly-owned subsidiary are not deductible by petitioner. Marion *133 N. Fisher, Esq., and Leon L. Rice, Jr., Esq., Box 199, Winston-Salem, N.C., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax for the calendar year 1949 in the amount of $1,063,555.43 and in income and excess profits taxes for the calendar year 1950 in the amount of $1,275,510.88. The questions presented are: (1) whether distributions from annual profits to stockholder-employees in proportion to such stockholdings constitute, in whole or in part, additional compensation payments for which the petitioner is entitled to a deduction, or preferential dividends; (2) if such distributions are in the nature of additional compensation payments, what portion thereof represents reasonable additional compensation; (3) may the distributions be deducted as ordinary and necessary business expenses; and (4) may the distributions constitute an element of petitioner's cost of goods sold and be deducted in toto on such ground. Findings of Fact Petitioner, a New Jersey corporation, organized in 1899, engages in the manufacture and sale of cigarettes, smoking and chewing tobaccos. *134 Its executive offices and principal manufacturing plants are located in Winston-Salem, North Carolina. Petitioner, an accrual basis taxpayer, timely filed its various required tax returns for the taxable years 1949 and 1950, based on the calendar year, with the collector of internal revenue for the district of North Carolina. Glenn Tobacco Company (hereinafter referred to as Glenn), a North Carolina corporation, organized in 1922, is a wholly-owned subsidiary of the petitioner, engaging exclusively in the purchase of leaf tobaccos in foreign countries for the petitioner. Glenn files its own separate corporate income tax returns. In its returns for 1949 and 1950, the petitioner claimed deductions or allowances for amounts paid under Article XII of its by-laws to its employees and to the employees of Glenn. The amounts so paid and claimed in petitioner's 1949 income tax return and in its 1950 income and excess profits tax returns are as follows: 1949
1950
In compensation of
officers
$ 437,406.75
$ 389,686.00
In cost of goods sold
3,346,799.95 *
2,087,104.80
$2,784,206.70
$2,476,790.80
Respondent disallowed such deductions. In 1911, in accordance *135 with the decision in United States v. American Tobacco Co., 221 U.S. 106, four principal tobacco manufacturing companies emerged from the dissolution of the so-called American Tobacco Company trust, namely, The American Tobacco Company, Liggett & Myers Tobacco Company, P. Lorillard Company (hereinafter referred to as American, Liggett and Lorillard, respectively), and the petitioner. In March 1912, American, Liggett and Lorillard each adopted by-laws providing for participation in profits by certain officers of such companies. The by-laws of each provided that beginning with 1912, 10 per cent of the annual net profits of the company in excess of a base amount, estimated as the net profits earned during 1910 by the businesses belonging to the company after the dissolution of the tobacco trust, should be paid to the president and five vice presidents of the company in these proportions: One-fourth to the president and one-fifth of the remainder to each of the five vice presidents. The payments were denominated salary for the year in addition to the fixed salary of each of the officers. During the same month, Lorillard adopted an additional by-law providing for a distribution of 5 per *136 cent of its net profits above the same base amount among such employees, other than the president and vice presidents, as the board of directors should determine and in the amounts determined by the board. Such distribution is not specifically described as a payment of salary in the additional Lorillard by-law. On August 1, 1912, the board of directors of the petitioner held a meeting and ordered the calling of a special meeting of the stockholders for the purpose of considering and acting on a proposed by-law for the participation in profits of the petitioner by certain officers and employees. The purpose of the proposal was set forth by a letter from the secretary of the petitioner, dated August 2, 1912, transmitting to the stockholders the notice of this special meeting, reading in part as follows.. "After full consideration, the Board of Directors have determined that the interest of the Company and all of its stockholders will be materially advanced by encouraging its officers and employes, a number of whom are not stockholders, to invest in its stock and to be thus more closely identified with its stock and to be thus more closely identified with its affairs. "To promote this *137 co-operation, it is proposed that, beginning with the year 1912, all of the officers and employes of the Company who have owned its stock and been in its employ for not less than twelve months be allowed, at the option of the Board of Directors, to participate, in proportion to the stock thus owned, in the annual profits, if any, earned by the Company, in excess of profits earned during the year 1910, not exceeding in the aggregate 10% of such excess." Likewise, the notice of the special meeting accompanying the letter set forth the proposed plan in substantially the same language as hereinbefore quoted from the secretary's letter. Subsequently, by a letter dated August 8, 1912, R. J. Reynolds, then president of the petitioner, further explained the proposed by-law as follows: "In answering a few of our stockholders, with reference to the plan for promoting the further co-operation of its officers and employes in advancing the interests of the Company and all of its stockholders, as set forth in recent notice of Stockholders' Meeting, to be held August 23rd, some of the questions that have been asked suggest information, given below, which other stockholders will doubtless be pleased *138 to have. "The profits of the Company for the year 1910 were 22.19% of its $7,525,000 capital stock and were taken as a basis because the calculations on businesses and brands for 1910, as shown in the plan submitted to the Court by The American Tobacco Company and others, were, in effect, those upon which the dissolution was based. Profits for 1910 have likewise served as a basis upon which other companies interested in the dissolution have, this year, formulated and adopted By-Laws providing funds, not exceeding 10% of excess profits, for distribution among certain of their officers. "The proposed By-Law to be considered and acted upon by the stockholders will provide, in detail that the funds for distribution among officers and employes holding stock must not exceed 10% of those profits of the Company which are in excess of 22.19% of its entire outstanding issue of common stock, taking into account the proposed new issue of $2,475,000, when made. "Employes, as well as officers, holding stock, will be allowed to participate in the funds to be created; but the distribution will only be made in proportion to that stock which has been bona fide owned by the officer or employe for one *139 year prior to the date of distribution. This will be a check against speculation on the proposition and will also be an inducement for its valued officers and employes, 48 of whom are not stockholders, to become permanently interested in the Company as such." The by-law proposed by the board of directors was adopted on August 23, 1912, at the special meeting of the stockholders by a vote of 63 per cent of the outstanding stock and without any dissenting vote. The by-law, then designated Article XIII, provided as follows: "Participation of officers and employees in certain profits "All of the Company's Officers and Employees who have owned its stock and been in its employ for not less than twelve months, may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate, in proportion to the stock thus owned, in the Company's annual profits which are in excess of the percentage of profits earned during the year 1910, to wit: 22.19%, not exceeding however, 10% of those profits, in excess of 22.19% of its entire outstanding issue of common stock, taking into account pro rata, any increase or decrease thereof, made during the year." *140 At a meeting of the board of directors of petitioner held on December 22, 1915, subsequent to amendment of petitioner's charter in 1913 to authorize the issuance of preferred stock and the sale of some of such preferred stock in 1915, Article XIII of the by-laws was amended to provide as follows: "Participation by officers and employees in certain profits "All the Company's officers and employees who have owned its common stock and been in its employ for not less than twelve months, then next preceding may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate in proportion to the common stock thus owned, in the Company's annual profits, which are in excess of the percentage of profits earned during the year 1910, to wit: 22.19 per cent, not exceeding, however, ten per cent (10%) of those profits in excess of 22.19 per cent, of its entire outstanding issue of common stock, taking into account pro rata, any increase or decrease thereof made during the year. The common stock owned by an officer or employee, for the purposes of this By-Law, beginning with the year 1916, shall include any stock purchased during the year from *141 an officer or employee or from the personal representative of a deceased officer or employee, provided such stock would have entitled the former owner to participate in proportion thereto, had it been held for the entire twelve months period." (Article XIII of the by-laws was renumbered Article XII by act of the board of directors on March 7, 1929, and all reference to the by-law will hereinafter be as Article XII.) Beginning in 1915, the petitioner adopted the practice of deducting from annual profits the dividends accrued on its preferred stock (issued and sold for the first time in 1915 and outstanding from time to time thereafter) in determining the amount of participation payable under the by-law. Such practice was continued throughout the administration of the by-law with respect to the years in which preferred stock has been outstanding and was specifically made a part of the by-law as subsequently amended in 1949. Dividends paid on the petitioner's outstanding preferred in 1949 and 1950 amounted to $2,934,000 in each such year. At the time of adoption of the by-law, petitioner had only one class of stock outstanding, hereinafter referred to as A stock, which was common stock *142 of $100 par value per share, consisting of 100,000 shares at the end of 1912, and having an aggregate par value of $10,000,000, representing paidin capital of such amount. In 1918, petitioner issued a Class B common stock, $100 par value per share, in the total amount of 100,000 shares, having an aggregate par value of $10,000,000, and representing paid-in capital of such amount. In 1920, the Class B common stock was replaced by stock denominated New Class B common stock having a par value of $25 a share, each share of classs B common stock being exchanged at that time for four shares of New Class B common stock. Also in 1920, the A stock was split four for one, and its par value was reduced to $25 per share. In 1929 a further split-up of 2 1/2 shares for one occurred with an accompanying reduction in par value to $10 per share. These transactions and reductions in par value increased the number of shares of A stock then outstanding to 1,000,000 shares having an aggregate par value of $10,000,000. In that same year, the New Class B common stock was also changed by a split-up of 2 1/2 shares for one accompanying a reduction in par value to $10 a share. During this same period, 1920-1929, *143 stock dividends on New Class B common stock were distributed alike to the holders of A stock and New Class B common stock in 1920 at the rate of 200 per cent, in 1922, at the rate of 33 1/3 per cent and in 1927, at the rate of 25 per cent. At the time of a subsequent amendment of the by-law in 1949, described infra 1,000,000 shares of A stock with a par value of $10 per share were outstanding and 9,000,000 shares of $10 par value New Class B common stock were outstanding. Only the original class of common stock (A stock) was eligible for participation under the by-law. Certificates for New Class B common stock outstanding in 1949 and 1950 provided that each share of common (A stock) and each share of New Class B common stock should be equal in every respect except that the New Class B common stock should not be considered under the petitioner's plan providing for participation by officers and employees in the allotted portion of profits. Until the time of the amendment of the by-law in 1949, only common stock was entitled to vote, except for 200,000 shares owned by the petitioner and held in a Company Retirement and Insurance Investment Fund, hereinafter described, which shares could *144 not be voted either directly or indirectly under New Jersey law. In 1929 petitioner undertook a plan for payment of retirement and disability benefits to its employees and in addition made available to its employees the privileges of group life insurance, total and permanent disability insurance, and accident and health insurance. Later, by resolution of the board of directors, adopted January 1, 1934, effective December 31, 1933, petitioner established an account on its books known as the Retirement and Insurance Investment, Fund in pursuance of such retirement and group insurance plans. On such date petitioner owned 200,000 shares of its common (A) stock, 100,000 of which shares had been acquired by petitioner in 1933 from four of its directors in exchange for 100,000 shares of New Class B common stock, 29,000 of which had been acquired by the petitioner upon default of employees on certain of their purchases, and the remaining 71,000 shares of which petitioner had on hand but had made no effort to allocate and sell to employees due to general financial conditions and the consequent inability of the employees to buy the stock. The cost to petitioner of such stock was $10,120,000, *145 and it was being carried then among petitioner's assets at cost. The January 1, 1934 resolution, adopted to provide a source of income to defray the costs incident to continuation of the retirement and group insurance plans, provided in part: "(1) That out of the income from the 200,000 shares of Common Stock of the Company hereinabove described, and as said income is received, there shall first be reserved a sum corresponding to interest sufficient to provide the Company a return upon any balance of its investment in said shares at a rate in line with current returns on short-term U.S. Government securities and the remainder of the income shall be currently set apart for use in defraying the cost to the Company of carrying the aforesaid Retirement and Group Insurance Plans, subject to the limitations therein contained, and the surplus, if any, at the end of each year, shall be applied, along with the fund hereinafter provided for in paragraph (2) hereof, as a reserve in reduction of the Company's investment in said shares. "(2) That by way of building a reserve in reduction of the investment of the Company in said 200,000 shares of Common Stock, there shall be set up on the books *146 of the Company at the end of each year, beginning with the year 1934, an item to be carried to reserve in reduction of the Company's investment in said shares of stock, the amount of which item is to be arrived at as follows: "When the amount, if any, of the Company's profits for the year which might be distributed as participation under Article 12 of the By-laws is determined, this amount shall be divided by a figure representing the total number of shares of Common Stock qualified under said By-Law for participation for that year plus the number of shares of said stock held for the purposes stated in this resolution. The quotient so arrived at shall be multiplied by the number of shares of Common Stock held for the purposes of this resolution and the amount so arrived at shall be accepted as the sum to be set aside from Company profits for the year and credited to the reserve in reduction of the Company's investment in the shares herein referred to. "(3) After the reserve fund herein provided for shall have reached an amount equaling the Company's investment in said shares, the Directors shall continue to make each year an appropriation, in amount and in manner as provided for in *147 paragraph (2) above, to be used as a supplement to the income of the Investment Fund for purposes of meeting the expenses of the Company's insurance and pension systems and/or as an addition to said Investment Fund." The effect of the resolution was to reduce the percentage of profits distributable to employees and to cause such profits which otherwise would have been distributable to employees to be applied toward defraying the cost to the company of the employee benefit plans. Commencing with 1934, there has been deducted from the amount of the participation fund an amount equivalent to the participation accruing with respect to these 200,000 shares of A stock. At the time of the later amendment of the by-law in 1949 these 200,000 shares of A stock were carried in the Retirement and Insurance Investment Fund at the nominal amount of $1.00. The Retirement and Insurance Investment Fund was discontinued pursuant to action of the stockholders of the petitioner at a meeting held on June 29, 1949; and under by-law XII, as amended at that meeting, the reduction of the participation fund by the amount of participation otherwise payable to the employees and attributable to the 200,000 shares *148 of A stock was continued in effect by specific provision. Beginning with the year 1923, following the organization of Glenn, the petitioner adopted the practice of making payments under the by-law to employees of the subsidiary who owned common stock of the petitioner and who otherwise qualified under the by-law. The by-law, as amended in 1949, made specific provision for participation by employees of the subsidiary. During World War I, the board of directors of the petitioner provided for the continuance of participation payments under the by-law in the cases of employee stockholders in the armed forces. A similar provision was made with respect to World War II and, following World War II, with respect to peacetime military and other service within the scope of the Selective Service Acts of the United States - such provision being made a part of a general plan for continuance of employee benefits as, for example, family hospitalization and group life insurance. Except as modified by the aforesaid deduction from profits for dividends on preferred stock and the aforesaid reduction of participation payments by reason of the 200,000 shares held in the Retirement and Insurance Investment *149 Fund, the amount set aside and distributed by the petitioner to employees pursuant to the by-law for each of the years 1912 through 1950, was the maximum percentage of the profits of the petitioner which could be so set aside and distributed under the by-law applicable with respect to each such year. At a special meeting of the stockholders of the petitioner held on June 29, 1949, Article XII of the by-law was further amended as part of a plan adopted as a whole by the stockholders. Other than amendment of the by-law, the plan, inter alia, called for: "(a) Amendment of the petitioner's Certificate of Incorporation to provide: "(1) Equal voting rights and privileges for the holders of New Class B common stock with the holders of common stock, one vote per share; * * * "(2) An option to the holders of common stock to exchange, on or before March 31, 1959, their common stock with the petitioner for New Class B common stock on the basis of one share of common for 1 1/4 shares of New Class B common stock; and, upon expiration of the exchange option the reclassification of each share of common stock not exchanged into one share of New Class B common stock; "(3) For the reclassification of *150 the 200,000 shares of common stock owned by petitioner into 200,000 shares of New Class B common stock; "(4) For the decrease of authorized common stock from 1,000,000 shares to 800,000 shares and the increase of authorized New Class B common stock from 13,000,000 shares to 15,000,000 shares; "(b) Discontinuance of the Retirement and Insurance Investment Fund. "Article XII of the by-law was amended as follows: "ARTICLE XII "Participation by Officers and Employees in Certain Profits. "All officers and employees of the Company, or any of its wholly-owned subsidiaries, who have owned Common Stock of the Company eligible for participation (sometimes referred to herein as 'eligible Common Stock' [A stock]) and been in the employ of the Company, or any such subsidiary, for a full calendar year may be allowed, in the discretion and at the option of the Board of Directors, to participate for such year, to the extent hereinafter provided, in a percentage not exceeding the below specified percentage for such year of that part of the Company's profits for such year as exceeds $2,219,277.60 plus the amount of dividends accrued for such year with respect to the outstanding shares of Preferred Stock *151 of the Company, the maximum percentages for the respective years being as follows: 10% for 1949; 9% for 1950; 8% for 1951; 7% for 1952; 6% for 1953; 5% for 1954; 4% for 1955; 3% for 1956; 2% for 1957; 1% for 1958; and none for any year thereafter; * * * [Other terms and restrictions contained in the by-law are reflected in Exhibit 13 attached to the Stipulation and are incorporated herein by reference.] "For the purpose of this By-Law, Common Stock eligible for participation shall be limited to (i) such shares of Common Stock of the Company as were owned throughout the year 1949 by officers and employees of the Company, or its wholly-owned subsidiary, and (ii) such other shares of Common Stock as were owned by such officers and employees on May 24, 1949. An officer or employee shall be deemed, for the purpose of this By-Law, to have owned for a full calendar year any shares of Common Stock owned by him or her throughout such year and also any shares of Common Stock owned by him or her at the end of such year if purchased by him or her during such year "(i) from an officer or employee of the Company, or any wholly-owned subsidiary of it; or "(ii) from a person who had been such an officer *152 or employee and who had been discharged or had resigned by request within ninety days next preceding the date of such purchase or who had retired, on a pension or retirement allowance provided by, or through a plan of, the Company or any of its wholly-owned subsidiaries, within ninety days next preceding the date of such purchase; or "(iii) from the personal representative of such a deceased officer or employee who had died within the twelve calendar months next preceding the date of such purchase; "provided that the seller of such shares of stock, or in the case the seller be the personal representative of a deceased officer or employee then such officer or employee, would have been entitled to participate with respect to such shares of stock had the seller, or such deceased officer or employee, continued to own said stock for the entire year and to remain in the employ of the Company, or any wholly-owned subsidiary of it, for such entire year. "As used in this By-Law, the word 'profits' shall mean the net earnings of the Company computed in accordance with sound accounting practice without deduction, however, for any amounts payable pursuant to the provisions of this By-Law." The *153 distributions made in 1949 and 1950, here in issue, were so made pursuant to the amended by-law. Petitioner's management explained the reasons for the amendment of the by-law in the proxy statement which accompanied the notice of meeting of stockholders for June 29, 1949, in part, as follows: "* * * The primary purpose of the amendment is to provide for the gradual elimination over a ten-year period of the right to participate in the benefits provided by the By-Law which in its original form was approved by the stockholders in 1912. Under the presently existing By-Law, in the discretion and at the option of the Board of Directors, part of the profits of the Company for any year in excess of 22.19% of the par value of the Common Stock, not exceeding, however, 10% of the amount of such excess, may be distributed to all qualified officers and employees proportionate to the number of shares of Common Stock held by them. In administering the By-Law there have been deducted from profits, in computing the amount of participation payable, dividends accrued on outstanding shares of the Company's Preferred Stock, and in the proposed amendment express provision is made for such deduction. * * *154 *
"During the many years following adoption of By-Law XII in 1912, it was found that the By-Law aided materially in the progress and development of the Company particularly as the result of requiring employees to make substantial investments in the Company before they could participate in the benefits of the By-Law. In recent years, however, due principally to the very high rates of income tax and also to restrictions upon borrowings for the purchase of listed stocks, it has been found that newer employees lacking outside resources have been unable to acquire Common Stock in sufficient quantities for the By-Law to serve as an incentive to them. It is therefore the opinion of the management that in the foreseeable future the By-Law will be of decreasing usefulness in providing an incentive to the employees. "As previously stated, 1,769 officers and employees, including directors, participated under the By-Law in the year 1948 and received an aggregate amount of $2,370,104. A very large number of these persons have invested substantially all their resources in the Common Stock of the Company and rely upon the income derived therefrom, including participation, to maintain their standards *155 of living. It is believed by the management, therefore, that it would be extremely detrimental to the Company and to the morale of the employees if action should be taken to discontinue participation immediately. While the management is of the opinion that it is to the best interest of the Company eventually to discontinue the method of profit participation under the By-Law, it believes that it is necessary to approach this goal on a gradual basis. The management regards the proposed amendment to the By-Law an equitable and feasible basis for adjusting the situation in so far as the Company, its stockholders and its employees are concerned. * * *
"The Plan outlined above is the result of a long and careful study that has been made by the management in an effort to simplify the corporate structure of the Company and eventually to eliminate the participation under the present Article XII of the By-Laws in certain profits of the Company by officers and employees holding its Common Stock. The management is of the opinion that the Plan is for the best interests of the Company and all of its stockholders and that the Plan, if adopted, will make possible, in an equitable manner and with due *156 recognition being given to the invested values of the holders of Common Stock, the achievement of the ultimate goal of having only one class of common stock in which all holders will have the same rights. "The ordinary dividends paid on the Company's Common Stock and New Class B Common Stock, respectively for the year 1948 amounted to $2.00 per share, and the special disbursement paid for the year under the Company's By-Law XII on Common Stock held throughout the year by officers and employees of the Company amounted to $4.66 per share. Common Stock held throughout 1948 by the participating directors and officers of the Company, considered as a group, amounted to 111,485 shares." The other three tobacco companies, American, Liggett and Lorillard, in 1949 and 1950 still had in effect by-laws providing for participation in profits by certain officers of such companies. In the case of American and Liggett the payments were still restricted to designated officers but such payments were based upon a smaller percentage of net profits in excess of a stated amount than was provided in the original by-laws. In the case of Lorillard, the by-law in effect in 1949 and 1950 provided for payments *157 of "incentive compensation income" based on designated percentages of consolidated net income, less dividends, to certain specified officers and a designated percentage to such other officers and key personnel of the company and its subsidiaries in such amounts as the board of directors should determine. The payments by these companies are in no way based or contingent upon stock ownership in the respective companies by an officer or employee as they are in the case of petitioner. The principal acquisitions of common stock of the petitioner by its officers and employees, either directly or indirectly from the sources indicated, were as follows: Principal Acquisitions of Common Stock By Directors And Other Employees
(All Shares Converted to $10.00 Par Basis)
To Directors and
Subsequent Directors
To Other Employees
Total
Number
Number
Number
of Trans-
of
of Trans-
Year
actions
Shares
actions
Stock Acquired from Various Sources
1912
27
18,930
51
1914
4
500
12
1915
47
14,320
140
1916
25
5,910
138
1917
20
7,920
134
1920
6
9,650
237
1921
10
9,788
442
1922
14
59,817
330
1923
16
36,741
708
1924
1
250
973
1934-5
2
1,085
360
Subtotals
164,281
Stock Acquired From Duke Interests
1926
10
9,647
1,204
Stock Acquired From Thomas F. Ryan
1926
3
35,375
3
Stock Acquired From Safe Deposit & Trust Company, Baltimore, Maryland,
Trustee U/W R. J. Reynolds and Wife, Katherine S. Reynolds
1928-9
20
54,702
2,487
Stock Acquired From Bowman Gray Estate
1935
12
11,594
1,394
Stock Acquired From Other Directors And Estates of Directors
1934
4
20,016
182
1937
3
700
858
1939
3
2,526
170
1940
3
15,000
75
1941
4
1942
2
1943
2
60
214
1946
2
700
495
1947
3
1,160
206
1948
1
400
98
1949
1
1,200
198
Subtotals
41,762
Grand Totals
317,361
*158 Principal Acquisitions of Common Stock By Directors And Other Employees
(All Shares Converted to $10.00 Par Basis)
Total Number of
Shares Acquired
Without Conver-
sion to $10 par
Total
basis (3 different
Number
Number
Number
par values
of
of Trans-
of
are represented
Year
Shares
actions
Shares
through 1929)
Stock Acquired from Various Sources
1912
19,910
78
38,840
3,884
1914
750
16
1,250
125
1915
9,720
187
24,040
2,404
1916
12,910
163
18,820
1,882
1917
8,230
154
15,520
1,552
1920
17,228
243
26,878
10,752
1921
39,704
452
49,492
19,797
1922
24,420
344
84,237
33,695
1923
35,712
724
72,453
28,981
1924
22,523
974
22,773
9,109
1934-5
8,835
362
9,920
9,920
Subtotals
199,942
364,223
122,101
Stock Acquired From Duke Interests
1926
61,513
1,214
71,160
28,464
Stock Acquired From Thomas F. Ryan
1926
1,875
6
37,250
14,900
Stock Acquired From Safe Deposit & Trust Company, Baltimore, Maryland,
Trustee U/W R. J. Reynolds and Wife, Katherine S. Reynolds
1928-9
130,411
2,507
185,113
74,045
Stock Acquired From Bowman Gray Estate
1935
58,506
1,406
70,100
70,100
Stock Acquired From Other Directors And Estates of Directors
1934
9,684
186
29,700
29,700
1937
33,300
861
34,000
34,000
1939
4,974
173
7,500
7,500
1940
7,108
78
22,108
22,108
1941
7,000
4
7,000
7,000
1942
5,100
2
5,100
5,100
1943
11,582
216
11,642
11,642
1946
36,062
497
36,762
36,762
1947
16,616
209
17,776
17,776
1948
5,460
99
5,860
5,860
1949
14,949
199
16,149
16,149
Subtotals
151,835
193,597
193,597
Grand Totals
604,082
921,443
503,207
*159 In the preceding schedule, under "Stock Acquired from Various Sources," the stock enumerated following the years 1912, 1914, 1915, 1916, 1917, 1934 and 1935, was all purchased by the petitioner and resold to officers and employees. Petitioner did not purchase all of the stock listed for the other years but did participate in the allocation of the stock which was acquired in 1920, 1921, 1922, 1923, 1924, and 1934-35, the stock acquired from the Duke interests in 1926, that acquired from the Safe Deposit and Trust Company in 1928-29, and also that from the Bowman Gray estate in 1935. Subsequent to 1935 there were no allocations of stock by the petitioner. The acquisitions of stock as shown in the foregoing chart include some duplications with the result that the number of persons acquiring such stock was somewhat less than the total of the number of transactions, and some of the stock acquired was distributed and later reacquired with the result that the grand total of the number of shares aggregates more than the largest number of shares which participated at any one time under the by-law. In addition, some of the acquisitions represent transactions between members of the same family *160 and transactions between various directors. In 1935, the petitioner discontinued acquiring and selling common stock to its employees because of the existence of certain regulations of the Securities and Exchange Commission. From 1920-1935, however, the acquisition, selling and allotment of stock to employees were handled principally by James A. Gray, an officer of the petitioner from January 1920 until his death in 1952, at which time he was chairman of the board of directors. During that period, it was generally understood among the employees that stock should be bought only with the approval of management. Subsequent to 1935, petitioner did not directly supervise the acquisition of employees' stockholdings or allot stock to employees. James Gray, Bowman Gray and others of petitioner's management, however, continued to check on and observe employee stock acquisitions. The head of the stock transfer department of the petitioner would regularly note on the common stock transfer sheets whether the stock was in line for participation under the by-law. He then passed these sheets on to James A. Gray and other officers who noted the information shown thereon. In a number of instances, *161 Gray would request and get information about particular employees to whom common stock had been transferred, including the amounts of their salaries; and in a few cases he was very critical of employees who bought stock outside, and he would occasionally speak to some employees about having too much stock. Even this general supervision, however, was relaxed somewhat beginning in 1949, when it was known that the by-law was going out of existence, though as late as 1950 the employees understood that they ought not to purchase A stock without consulting a superior. Common stock, however, has been available for purchase on the New York Stock Exchange since 1922, and on an over-the-counter market in Winston-Salem, but open market purchases by employees were infrequent. During 1920-1935, whenever petitioner had available for distribution blocks of common stock, it would communicate its proposal to so distribute such stock to the employees, either in writing or by passing the word down through the department managers, superintendents, foremen or other supervisory personnel. The stock was thereafter allotted to the employees within the discretion of petitioner's management on the basis of *162 the amount of stock available, the requests or orders obtained from employees for such stock and the recommendations of the supervisory personnel regarding the amount of stock they believed should be allotted to particular employees. The allotments when made were then handled informally without action of the board of directors or of any management committee. Such allotments were made on a selective basis. The management did not recommend that all employees be afforded an equal opportunity to acquire stock. After discussion among the managerial heads concerned with the allotment of stock, a man who showed great promise would be allotted a few more shares than he requested, assuming that he could handle it financially, and in other cases the amount requested was reduced. Broadly, effort was made to place stock with employees who were doing a good job, showed promise, would be of greater value to the company, filled more important places, and had the interest of the petitioner "at heart." Of the employees who were afforded essentially equal opportunity to obtain stock, some exercised their privilege while others did not. In some instances the employee was unable to buy in and in other *163 instances the employee was unwilling to buy the stock offered to him. Some employees who purchased stock later lost it because of their inability to pay for it. On occasion, employees who were not approached by management with respect to the purchase of stock would request that they be permitted to purchase stock. These requests were sometimes turned down and at other times they were not. All such requests, however, were considered and evaluated. The largest single allotment of common stock ever undertaken by the management of the petitioner consisted of 74,045 shares (185,113 shares as converted to $10 par value basis) acquired from the Safe Deposit and Trust Company, Baltimore, Maryland, Trustee under the wills of Mr. and Mrs. R. J. Reynolds. (Such block of stock is hereinafter sometimes referred to as the Baltimore stock.) Under date of December 8, 1927, the trustee made a written offer to W. N. Reynolds, Bowman Gray and James A. Gray, officers and directors of the petitioner, to sell this stock at $194.475 per share with the regular dividend payable in January 1928 being paid to the three directors and the rights to the special dividend payable in 1928 being retained by the Trust *164 Company. The contract also provided for a down payment of a certain amount per share and installment payments of a certain amount per share in January of each of the years 1929 through 1933, the deferred installments bearing interest from January 1, 1928, at a rate of 5 per cent a year. The offer letter reads, in part, as follows: "While we are making this sale for the purpose of reducing our very large holding in R. J. Reynolds Tobacco Company stock, realizing cash and reinvesting it, we understand that one of your purposes in buying is to distribute the stock by resale among the employes of the company so as to enlarge the number of interested employes and carry out further the policy inaugurated by the late Mr. R. J. Reynolds and yourselves. We cannot, of course, stipulate for any distribution since the selection of employes, the amounts and all other considerations is necessarily to be determined by yourselves. Without, therefore, making it any term or enforcible condition of sale, we are making this memorandum of your stated intentions and stating that it was a factor which was taken into consideration in the judgment for sale." The offer was accepted by the said officers and *165 directors personally under date of December 15, 1927, and the agreement did not represent a contract or liability of the petitioner. The stock acquired pursuant to the contract was first offered to existing holders of participating common stock on the basis of one-third of their previous holdings. A form letter dated December 16, 1927, sent to such existing holders, advised each of them of the number of shares allotted to him, and stated, inter alia: "Since the effect of the purchase of the stock now offered is to increase substantially the number of shares eligible for participation in 1928 earnings, and thereby to reduce the per share rate of participation on any fixed figure for earnings, the only way for one to compensate for the reduction of the per share rate is to increase the number of shares held for participation. The number of additional shares offered to you is stated at the bottom of this letter." Not all of the employees who were offered Baltimore stock undertook to purchase such stock, and the shares not so purchased were thereafter offered for general distribution by further letter offering it to those who did not own stock and to the smaller stockholders. The Baltimore *166 shares were finally sold to about 2,100 employees in 1928 and 1929. At the same time the Baltimore stock was being offered to existing holders, the petitioner had on hand additional shares of common stock which shares were also offered to employees. Such offer is set forth in the following form letter, dated December 16, 1927: "Referring to the letter which we are to-day sending out to employees of the Company now owning Common Stock, offering them an opportunity to increase their holdings, we beg to say that we have a limited amount of stock which is available for those employees who at the present time do not own any or who have holdings of only a small number of shares each. This stock is now offered at its cost of $191.50 per share upon terms of $11.50 per share during January, 1928; $25.00 per share during January each year of 1929, 1930, 1931 and 1932 and the balance during January, 1933, interest on all deferred payments to be at the rate of 5% per annum, payable quarterly. "We will thank you to advise us the amount of stock that may be desired in your Division by men whom you could recommend to us as having the interest of the Company at heart. Please submit all orders in *167 time for same to be in our hands by December 31st, 1927. In submitting orders, please furnish full name and address of those ordering stock. On the enclosed memorandum you will find a list of stock now held in your Division. "You, of course, understand that we reserve the right to allot such number of shares on each order as may be available, considering all orders that we may receive. "In sending in your list, please advise should any of those ordering prefer to pay cash for the stock or handle through their own bank rather than as per the terms referred to above. "We enclose herewith a ready addressed envelope for use in giving us a report in this connection, and we request that, should you not have any orders to forward us, you write us to that effect on or before December 31st, 1927." With respect to all of the stock offered at this time (including both the Baltimore and the other stock) there was an oversubscription. The subscriptions were assembled, submitted to Gray, and he, after considering the recommendations of the department heads, scaled the subscriptions down in line with the total number of shares available. Most of the Baltimore stock was sold on credit to the employees. *168 Promissory notes obtained from the employees, tying in with the schedule of installment payments set out in the letter of December 8, 1927, were made payable to the petitioner which acted as collection agent for Safe Deposit and Trust Company, petitioner not being a party to the contract. These notes, secured by 157,837 shares ( $10 par), totalled $11,200,507.42 at the end of 1928. The notes were not carried on the books of the petitioner as company assets. There were, thereafter, extensions of time for payments of the installments, the final installment being payable in 1935. Employee notes for about 29,000 shares ( $10 par) of the Baltimore stock purchases were defaulted. The employees, however, sustained no losses, since the petitioner acquired the stock upon default and paid the employee the difference between the remaining amount of the note and the market value of the stock. From 1930 through 1933, petitioner's acquisitions of defaulted stock purchases were made upon refund to the employee of the actual amount which the employee had invested. Following the death of Bowman Gray, Sr., chairman of the board of directors of petitioner in 1935, the petitioner pursuant to the request *169 of the Wachovia Bank and Trust Company, co-executor of the estate of Bowman Gray, Sr., circularized all of its employees announcing an opportunity for subscription to the 70,100 shares of common stock owned by the estate of the deceased executive. Although such stock was not offered first to holders of participating stock as had previously been done with the Baltimore stock acquisition by certain of petitioner's directors, allotment of the stock to particular employees was handled in much the same manner as had been the allotment of the Baltimore stock. Subscriptions were assembled and submitted to James Gray, who scaled the subscriptions down in line with the total number of shares available, but gave preference to employees who had little or no stock. The stock offer was oversubscribed. About 1,400 employees purchased the stock. Petitioner collected the payments for the stock and forwarded such payments to the bank. The bank transferred the stock to the employees. In the main, the management of the petitioner encouraged selected employees, usually those who appeared promising, to buy common stock. For the most part, the employees who bought stock did so on credit, either company *170 credit or the credit of banks or other lending agencies. In a number of instances individual members of the management of the petitioner helped employees to finance purchases of common stock by endorsing their notes, and on occasion a director even put up his own stock as collateral. Before his death in 1918, R. J. Reynolds personally financed a number of stock purchases by employees. During the period from 1912 through 1933, the petitioner loaned money directly to employees to enable them to purchase common stock. The amount of such loans was based on the book value of the stock and did not exceed the book value of stock held by petitioner as collateral. The amounts outstanding on account of such loans at the end of each of the years of the period 1912 to 1934 ranged from a high of $2,974,922.05 in 1918 to a low of $265,042.28 in 1928, and was in excess of $1,000,000 for each of the years 1915 to 1923. The largest proportion of loans to employees, however, was made by agencies other than that of the petitioner. Petitioner also took over some of the loans that had personally been made by R. J. Reynolds at such time as the loans were reduced to a point where the amount thereof did not *171 exceed the book value of the stock held as collateral. After 1934, petitioner discontinued making loans to employees to enable them to purchase stock and thereafter held no notes receivable from employees for stock purchases. During the period 1912 to 1933, when the petitioner was making the various loans heretofore outlined, it would require all regular dividends and participation payments under the by-law on such stock as was held by it as collateral to be credited to the loans receivable account of the employee unless the employee's account was within the range of the book value of the stock so held and the employee had authority from an officer of the company to receive the participation payments. In addition, if stock dividends were issued on the common stock held as collateral, such stock dividend was required to be deposited as additional collateral, or if the stock received as a dividend was sold, the proceeds from such sale were to be used to reduce the note indebtedness. The Wachovia Bank and Trust Company in Winston-Salem also required that dividends and participation payments on stock held as collateral be applied to reduce the note indebtedness in the case of loans made *172 by it to petitioner's employees for their stock purchases. Other types of credit to the loans receivable account included proceeds from the sale of preferred warrants and fractional shares of B stock. Whenever the petitioner acquired common stock for the purpose of sale to its employees, such stock was sold at a price equal to the average cost per share of that block of stock to the petitioner. Frequently, the petitioner would sell stock to its employees for a price below the current market price and, with only one minor exception involving but a few hundred dollars, the petitioner never made any profit on the sales of stock to its employees. In 1933, four officers and directors of the petitioner exchanged a total of 100,000 shares of common (A) stock for an equal number of shares of B stock, even though the common stock was selling on the market at a price higher than the B stock. The petitioner took as the book value of the 100,000 shares of common stock the cost of the B stock which it used to make the exchange and thereby reduced the cost of the common stock to about $50 per share. These 100,000 shares of common stock were then used to make up one-half of the 200,000 shares put *173 into the Retirement and Insurance Investment Fund, described supra. Over the years some employees came to own amounts of stock which failed to represent a fair and reasonable relation to the job position, the responsibilities borne by the employee or his over-all worth to the petitioner. Such cases in the main are accounted for by stock acquisitions from inheritance, gift, purchases without management approval, by the failure of some to fulfill the promise they showed at the time of acquisition, and by the acquisition of additional stock in the early days through stock dividends and split-ups. Nevertheless, over-all, excessive holdings were not considered by the management to have affected the generally satisfactory operation of the by-law. The number of individuals participating under the by-law in 1912 was 27, 8 of whom were directors of the petitioner. Thereafter, the number of participants increased in almost every year through 1928, the greatest increase occurring in the period from 1921 through 1928, during which the number of participants grew from 308 in 1921 to 2,177 in 1928, marking the largest number of individuals ever to participate under the by-law. The number of participants *174 dropped off in the early 1930's and gradually increased again to slightly more than 2,000 by 1937, thereafter remaining practically static through 1941. The number of participants gradually decreased again until 1949. In 1949 there was an increase in the number of participants to 1,906; and in 1950 there were 1,874 participants. Fifteen directors participated for each of the years 1949 and 1950. All such participants were owners and holders of record of the common stock with respect to which they participated under the by-law. The amount of outstanding common stock eligible for participation and owned by employees dovetailed to a large degree with the varying number of participants. Converted to a $10 par value basis, the number of shares participating for 1912 was 191,400. By 1920, the number had increased to 250,490; by 1928, to 850,037, the largest number of shares ever to participate. Thereafter the number of shares gradually declined, fluctuating in minor respects in various years, the shares participating for 1949 being 562,466 and for 1950 being 562,907. The percentage of the total participating payments going to directors declined from 1912 through 1950. The director group *175 received 96.53 per cent of the participation payments made for 1912, but only 16.64 per cent for 1949 and 16.68 per cent for 1950. Various factors account for such decrease, among which a few of those easily identifiable are: the exchange in 1933 by four directors of 100,000 shares of participating stock for 100,000 shares of new Class B common stock; the death and retirement of various directors and the reclassification of their participating stock to nonparticipating stock; and the acquisition by non-director employees of 210,341 shares from directors and estates of directors between 1934 and 1949. The number of employees of Glenn participating under the by-law has varied from a low of 8 for 1923 to a high of 23 for 1929, the number participating for 1949 and 1950 being 14. In the period 1922-1950, the number of participating shares (converted to $10 par) owned by Glenn employees has varied from a low of 1,912 in 1924, to a high of 11,535 in 1950. The number of such shares for 1949 was 9,650. The following is a summary for each of the years 1949 and 1950, showing the categories of employment of the participating employees and, with respect to each category, the number of individuals, *176 the number of participating shares, the dollar amount of participation paid, the fixed salaries or wages, and the total fixed salaries or wages and participation: Number
Number
Participation
Individuals
Shares
Paid
1949
Admin., Selling and Adver. Oper-
ations
696
305,378
$1,511,621.10
Leaf Buying & Mfg. Operations
1,098
233,418
1,155,419.10
Glenn Tobacco Co. Employees
14
9,650
47,767.50
Const. & Maintenance Employees
98
14,020
69,399.00
Grand Totals
1,906
562,466
$2,784,206.70
1950
Admin., Selling and Adver. Opera-
tions
698
305,516
$1,344,270.40
Leaf Buying & Mfg. Operations
1,066
233,984
1,029,529.60
Glenn Tobacco Co. Employees
14
11,535
50,754.00
Const. & Maintenance Employees
96
11,872
52,236.80
Grand Totals
1,874
562,907
$2,476,790.80
Total
Fixed
Salaries &
Salaries
Participation
Admin., Selling and Adver. Oper-
ations
$3,429,292.00
$ 4,940,913.10
Leaf Buying & Mfg. Operations
3,807,153.00
4,962,572.10
Glenn Tobacco Co. Employees
87,030.00
134,797.50
Const. & Maintenance Employees
298,264.00
367,663.00
Grand Totals
$7,621,739.00
$10,405,945.70
Admin., Selling and Adver. Opera-
tions
$3,621,161.00
$ 4,965,431.40
Leaf Buying & Mfg. Operations
3,980,238.00
5,009,767.60
Glenn Tobacco Co. Employees
91,780.00
142,534.00
Const. & Maintenance Employees
300,875.00
353,111.80
Grand Totals
$7,994,054.00
$10,470,844.80
*177 All moneys used by Glenn in the purchase of leaf tobaccos and the payment of its operating expenses are supplied by the petitioner as advances on open account. The tobacco purchased is invoiced to the petitioner by Glenn at a unit price estimated to include all of the subsidiary's costs therein plus a fixed profit. During 1949 and 1950, Glenn's outstanding capital stock was $25,000. By agreement between the petitioner and Glenn, the annual net earnings of the subsidiary are limited to six per cent of the capital stock, or $1,500 a year. All of the net earnings of the subsidiary remaining after the payment of income taxes are paid to the petitioner as dividends, and no book surplus is maintained by the subsidiary. The fixed salaries paid by Glenn to its employees are recorded on the subsidiary's books and become a part of the unit sales price of tobacco sold to the petitioner. Participation payments are paid by the petitioner and recorded on its books in the same manner as participation payments to its own employee-stockholders, no charge being made to the subsidiary for such disbursements. Such amounts are not included as a part of the selling price of tobacco sold by the subsidiary *178 to the petitioner, nor are they treated as a part of the subsidiary's expense. For 1949, 84.6 per cent of the regular employees of the petitioner did not participate under the by-law. For 1950, 84.4 per cent of the regular employees did not participate. For 1949, the participation payments under the by-law amounted to 36.5 per cent of the fixed compensation of the participating employees, and for 1950, the participation payments amounted to 31 per cent of such fixed compensation. For 1949, the participation payments amounted to 8.6 per cent of the total fixed compensation paid to employees of the petitioner, and for 1950 the participation payments amounted to 7.1 per cent of such total fixed compensation. In 1949 the total fixed compensation plus participation payments paid to participating employees was $10,405,946. The participation payments ($2,784,207) were 26.76 per cent of this amount. In the same year, total fixed compensation to all employees plus participating payments was $34,699.738. The participation payments were 8.02 per cent of this amount. In 1950, the total fixed compensation plus participation payments paid to participating employees was $10,470.845. The participation *179 payments ($2,476,791) were 23.65 per cent of this amount. In the same year, total fixed compensation to all employees plus participating payments was $36,621,921. The participation payments were 6.76 per cent of this amount. For each of the years 1949 and 1950, all of the 15 officers and directors of the petitioner were participants under the by-law, all being employees. For 1949, each regular employee of the petitioner, exclusive of officers and directors, whose fixed annual compensation equalled or exceeded $8,000 was a participant, there being 64 such employees. For 1950, each regular employee of the petitioner whose fixed annual compensation equalled or exceeded $9,000 was a participant, there being 61 such employees, including three Glenn employees. In general, the percentages of such employees participating under the by-law decreased as the annual amount of fixed compensation decreased for 1949 and 1950, as appears on the following schedule: Percentage
Number
Annual Fixed
Of Employees
Employees
Compensation
Participating
1949
31
$7,000-$7,999
84%
68
6,000-6,999
90%
164
5,000-5,999
88%
350
4,000-4,999
74%
1,417
3,000-3,999
46%
4,534
2,000-2,999
13%
5,562
0-1,999
2%
1950
17
8,000-8,999
88%
36
7,000-7,999
94%
77
6,000-6,999
86%
185
5,000-5,999
87%
451
4,000-4,999
71%
1,846
3,000-3,999
34%
5,196
2,000-2,999
10%
4,007
0-1,999
1 1/2%
*180 During each of the years 1912 through 1950, the petitioner paid regular dividends on its common stock and, during each of the years 1918 through 1950, the petitioner paid regular dividends on its common and Class B common stocks at the same rate per share. Such regular dividends were paid to all holders of such stocks irrespective of whether they were employees or nonemployees of the petitioner. The participation payments under the by-law with respect to each of the years 1912 through 1950 were paid only to employees of the petitioner or of its wholly-owned subsidiary, Glenn, who were considered by the board of directors to be qualified to participate in profits under the provisions of the by-law. The following is a tabulation of dividends paid on common stock and Class B common stock of the petitioner and amounts of participation paid under the by-law for the years indicated: Dividend
Participation
Years
Payments
Payments
1912-50
$641,901,884
$73,053,122
1949
19,660,886
2,784,207
1950
19,714,748
2,476,791
The 100,000 shares of common stock issued by the petitioner and outstanding at the end of 1912 were issued for a consideration of $100 per share and the 100,000 shares of Class B common stock *181 issued by the petitioner and outstanding at the end of 1918 were issued for a consideration of $100 per share. The petitioner never received any greater or different amount of paid-in capital on account of the common stock participating under the by-law than it received with respect to common stock not eligible for participation under the by-law. Common stock of the petitioner during and prior to the year 1950 was held by individuals not eligible to participate under the by-law. During the period 1940-1950 payments under the by-law were authorized in the following manner. Near the end of each year, a preliminary determination of the profits for the year was made by the comptroller, and a report thereof was made at a meeting of the board of directors. At such meeting the treasurer presented a complete list of all persons entitled to participate under the by-law for the year, showing for each individual the name, salary or wage for the year and the number of shares of common stock entitled to participate under the by-law. This list was read to the directors at the meeting. Thereupon the board of directors authorized and directed distributions, to be made after the end of the year, of *182 a specified dollar amount per share (or an amount not exceeding a specified dollar amount per share) to the holders of the stock eligible for participation. For the years 1940 through 1945, the resolution of the board declaring and authorizing the payments under the by-law referred to such distribution as a "participating dividend." Such resolution also declared that the distribution was "in accordance with the said By-Law and [would] serve the purposes and intention thereof," and that if such distribution "were to be tested on the basis of reasonable and proper compensation for those receiving same, it, with salary added, would not amount to more than a reasonable and proper compensation to each of said officers and employees for the year * * *." For the years 1946 through 1948, the resolution was substantially the same as the resolution for the years 1940 through 1945, including reference to the distribution as a "participating dividend," except that the declaration of the board with respect to the reasonableness of the distribution was to the effect that the distribution "will be reasonable and proper under said by-law and will serve the purposes and intention thereof." The resolution *183 of the board of directors of the petitioner authorizing the payments under the by-law for each of the years 1949 and 1950, and the procedure regarding the reading of the list of eligible individuals, were largely the same as the resolution and procedure with respect to the authorization of payments under the by-law for the years 1946 through 1948, through the distribution was not referred to as a participating dividend, but as "a distribution to be paid from a fund" based on profits, and a specific declaration of the distribution's reasonableness as salary was no longer contained therein, reference being made only to the effect that "said participation [is] found to be reasonable and proper under * * * the By-Laws and as serving the purposes and intentions thereof." The payments under the by-law have historically been treated by the petitioner on its books as a deduction from income in arriving at annual net earnings. During 1949 and 1950, and for many years prior thereto, the petitioner accrued monthly on its books an estimated portion of the expected year-end distribution under the bylaw by crediting such estimate to an account labelled "Provision for participation by officers and *184 employees in certain profits" and debiting an account labelled "Participation by officers and employees in certain profits." As of the end of each year, the total of the estimated monthly amounts was adjusted to the actual amount of the payment to be made under the by-law and charged against income ("Income account") for the year. Following the close of the year, when disbursements were made for the payments under the by-law, these amounts were charged against the account "Provision for participation by officers and employees in certain profits." The liability for regular quarterly dividends was set up by the petitioner as a credit to the dividends payable account with a corresponding debit to the dividend account. At the end of each year, the total amount of the dividends declared on the common and preferred stock was closed out and charged to the surplus and undivided profits account. The regular dividends are paid quarterly by the Chase National Bank in New York City as the dividend disbursing agent of the petitioner. Payments under the by-law, however, are paid by the petitioner by the issuance of checks to employees, ordinarily in January of each year, covering the participation *185 in profits for the preceding year. In the statements of earnings contained in the financial statements of the petitioner sent to its stockholders, for the year 1945 and years prior thereto, the participation payments under the by-law were treated as deductions from income or as expenses or as a part of the cost of goods sold. On such statements, the payments of regular quarterly dividends were deducted directly from the surplus or undivided profits account. In the annual reports for 1946 and subsequent years, the participation payments were treated as a deduction from income along with Federal and state income taxes, cost of goods sold, depreciation, interest and debenture expense amortization. Each such category of deductions from income was separately stated. Participation payments under the by-law were not treated as a part of the cost of goods sold on the books of the petitioner, nor were they charged into inventories. On the annual report, known as Form 10-K, filed by the petitioner with the Securities and Exchange Commission for 1949, a portion of the participation payments under the by-law was included in the cost of goods sold. In the proxy statements which the petitioner sent *186 to its stockholders with the notices of annual meetings held, respectively, in April 1950 and 1951, there was set forth in table form the remuneration paid for services in 1949 and 1950, respectively, to each person who was a director of the petitioner during the year and whose salary and participation payment for the applicable year exceeded $25,000 and the aggregate of all salaries and such participation paid to all officers and directors as a group. In its income tax return for 1936, the petitioner did not claim a dividends paid credit under Section 27 of the Revenue Act of 1936 on account of the amounts distributed for the year to employees pursuant to the by-law. However, upon the examination of such return, the respondent allowed such a credit to the petitioner. On its returns for 1937, 1938 and 1939, the petitioner claimed and was allowed similar credits by the respondent. Numerous factors have contributed to the achievement of such success as was achieved by petitioner in the tobacco industry. Among such factors was the beneficial effects on the services of employees of the operation of the by-law and petitioner's other benefit programs, the personal drive and leadership of *187 R. J. and Will Reynolds, the acceptance by the public of petitioner's blended tobacco cigarette, Camels, and the generally loyal and efficient services rendered petitioner by its employees. Specifically, petitioner's management considered that employees who owned common stock and thus participated under the by-law were better and more valuable employees, more efficient, more loyal, more dependable, more careful of expenditure of the company's money; that they showed tireless ingenuity, increased energy, enthusiasm, teamwork, and more alertness to human relations problems; that they set the pace for other employees who were not stockholders and aided in keeping up the standards and efficiency of the work; that they were constantly seeking to reduce waste and cut down on costs; and that they had the feeling that they were part owners of the company, and showed more interest in their work and in company affairs than did non-stockholder employees. The employees called the payments under the by-law "the bonus" and recognized that money saved by them for the company would mean a bigger bonus for them. As regards the effects of the operation of the by-law on the employees in its manufacturing *188 plants, petitioner found that there was less labor turnover, better attendance, many good suggestions in regard to improvements, that company efficiency improved, and that the attitude of the employees toward their fellow workers was better. Turnover was relatively lower among employees participating under the by-law than among non-participants. During 1949, the total number of employee separations (resignations and dismissals only) was 5.13 per cent of the number of regular employees on roll at the beginning of the year, the percentage for non-participants being 5.73 per cent, and for participants 1.37 per cent. For 1950, the corresponding percentages were 3.80 per cent for all employees, 4.09 per cent for non-participants, and 2.22 per cent for participants. During the five-year period 1947 through 1951, the percentages averaged as follows: All employees
6.67%
Non-participants
7.45%
Participants
2.06%
The ownership of A stock was not restricted to any particular category or group of employees but rather was owned by employees throughout the company, including salesmen, leaf tobacco buyers, cigarette machine operators, stenographers and file clerks. On many occasions people applying to *189 the personnel department of the petitioner for employment inquired about the participating common stock, though participation payments under the by-law were not payable to employee-shareholders until after twelve months of employment. Employee application forms made no inquiry as to whether or not the prospective employee owned common stock. It was assumed that a person applying for a job did not own such stock. Ownership thereof at such time was so unusual that it was not even considered pertinent in deciding whether or not the person would be employed, and such ownership had nothing to do with the rate of pay assigned at the time of employment. At the time of the dissolution of the American Tobacco Company trust in 1911 the petitioner was the smallest of the four principal tobacco companies which emerged. Its growth since 1911, however, has been relatively greater than the growth of the other three companies. In assets and value of sales, petitioner was in 1911 about onethird as large as Lorillard, less than onefourth the size of Liggett, and had about one-fifth the sales and one-twelfth the assets of American. The petitioner had 2.73 per cent of the smoking tobacco business of *190 the United States, 15.49 per cent of the plug tobacco business, and it had no cigarette business. Together, the three other companies had about 75 per cent of the smoking tobacco business, 65 per cent of the plug tobacco business, and 80 per cent of the cigarette business. By the end of 1950, the total assets of the petitioner were 84.27 per cent of the assets of American, 125.22 per cent of the assets of Liggett, and 482.63 per cent of the assets of Lorillard. The net sales of the petitioner for 1950 were 86.68 per cent of the net sales of American, 143.22 per cent of the net sales of Liggett, and 452.46 per cent of the net sales of Lorillard. For 1950, the petitioner had 32.22 per cent of the smoking tobacco business of the United States, 63.14 per cent of the plug tobacco business, and 26.94 per cent of the cigarette business. The other three tobacco companies combined had 55.09 per cent of the cigarette business for 1950, the largest percentage being 31.14 per cent in the case of American. Using the dollar amounts of capital and surplus of these four tobacco companies at December 31, 1912, as a base, by the end of 1938 the capital and surplus of the petitioner amounted to 895 per *191 cent of the 1912 figure, while corresponding figures for the other companies were 165 per cent for American, 338 per cent for Liggett and 150 per cent for Lorillard. As of December 31, 1950, the respective percentages of the 1912 figures were 231 per cent for American, 574 per cent for Liggett, 216 per cent for Lorillard, and 1,929 per cent for the petitioner. The capital and surplus of the four companies and the number of times that the capital and surplus of American, Liggett, and Lorillard exceeded the capital and surplus of petitioner in 1912, 1938, and 1950 were as follows: 1912
1938
1950
American
133,250
8.4
217,147
1.5
307,392
1.0
Lorillard
28,198
1.8
42,943
.3
60,876
.2
Liggett
42,683
2.7
147,571
1.0
244,968
.8
Reynolds
15,844
142,587
305,666 Neither borrowed capital nor funded debt of any of the four companies are included in the stated capital and surplus accounts. Between 1945 and 1949 the capital and surplus of the petitioner increased about $76,000,000 from about $212,000,000 to about $288,000,000, represented by an increase in surplus in the amount of $50,000,000 and by the issuance of 4.5 per cent preferred stock in the amount of $26,000,000. During the same period, petitioner's funded debt increased *192 from $6,000,000 to $145,000,000. During the years 1938 through 1950, the petitioner paid out a greater percentage of its equity capital (capital plus surplus) in the form of dividends (on common and preferred stocks) than did American. Likewise, petitioner paid out greater proportionate dividend payments during each of the years of this period than did Liggett and Lorillard, except in the case of Liggett for 1948, 1949 and 1950, and in the case of Lorillard for 1950. During some of the years 1938 through 1950, the petitioner and its three competitors paid the following percentage of net earnings as dividends, excluding A stock participation payments by petitioner: Year
Reynolds
American
Liggett & Myers
Lorillard
1938
96.9
102.2
83.4
82.8
1939
89.7
98.1
82.8
86.0
1940
88.1
91.4
84.3
76.1
1941
90.4
100.2
96.1
86.7
1942
85.6
78.1
79.0
74.9
1943
80.8
77.8
77.0
85.6
1944
84.2
89.1
81.3
82.4
1945
85.1
90.0
83.3
83.0
1946
68.9
59.3
76.3
83.5
1947
67.7
61.7
68.0
73.5
1948
63.5
53.1
58.6
71.9
1949
55.9
54.0
68.5
67.7
1950
56.3
59.1
72.3
71.9 For the years 1938 through 1950, the petitioner had over-all a relatively superior record of earnings than did the other three tobacco companies. Except for 1944, the dollar amount of the earnings of the petitioner before *193 taxes on income exceeded that of Liggett for all years during this period. Without exception, such earnings exceeded those of Lorillard. Petitioner's earnings before taxes for the 13-year period amounted to $606,776,064, while those of American amounted to $673,244,674. American's earnings, while only slightly greater than the earnings of the petitioner in 1941, 1945, 1946 and 1950, exceeded those of petitioner in all years except 1939 and 1947. Sales of petitioner exceeded those of Liggett and Lorillard for each of the years and sales of American exceeded those of the petitioner for each year except 1938, 1939 and 1940. For the same period, the petitioner generally had a higher ratio of earnings, before and after taxes on income, to sales, equity capital (capital stock and surplus), and total tangible capital (equity capital and borrowed capital, but excluding good will), than did such competitors. During the period 1940 through 1950 the productivity of the employees of the petitioner, as measured in terms of dollar sales per employee, was somewhat greater than that of its said competitors. Broadly, it has been the general policy of the petitioner, particularly in respect to its officer *194 and director group, to keep fixed salaries relatively low. The scale of wages for hourly workers, on the other hand, was, in the main, not less than the prevailing wage scale in the communities in which they worked. The fixed salaries of the individual officers and directors of the petitioner and of American for the years 1949 and 1950 were as follows: 1949
1950
Petitioner
American
Petitioner
American
1
$ 93,750
$120,000
$100,000
$120,000
2
60,000
120,000
66,250
101,333
3
48,000
50,000
52,750
68,667
4
48,000
50,000
52,750
50,000
5
35,000
50,000
48,500
50,000
6
32,250
50,000
37,750
50,000
7
29,666
50,000
33,500
50,000
8
29,500
50,000
32,250
50,000
9
24,333
50,000
28,500
50,000
10
18,750
50,000
21,500
50,000
11
17,833
50,000
20,500
50,000
12
17,600
50,000
20,500
50,000
13
14,625
40,000
17,488
47,333
14
14,000
40,000
16,500
40,000
15
12,700
36,000
16,250
40,000
16
32,500
34,667
17
30,000
32,000
Totals
$496,007
$936,500
554,988
$952,000 The following schedule shows the number of petitioner's regular employees (excluding officers and directors) by salary and wage bracket and aggregate fixed compensation for 1949 and 1950: 1949
1950
Number
Aggregate Fixed
Number
Aggregate Fixed
Bracket
Employees
Compensation
Employees
Compensation
$22,000 to $22,999
1
$ 22,833
21,000 to 21,999
2
$ 43,666
20,000 to 20,999
19,000 to 19,999
18,000 to 18,999
2
36,500
17,000 to 17,999
1
17,300
16,000 to 16,999
1
16,600
15,000 to 15,999
1
15,000
1
15,450
14,000 to 14,999
2
28,500
4
58,225
13,000 to 13,999
1
13,200
3
40,200
12,000 to 12,999
3
36,000
10
122,525
11,000 to 11,999
11
127,105
8
89,908
10,000 to 10,999
9
93,326
14
144,933
9,000 to 9,999
15
141,310
18
171,402
8,000 to 8,999
18
153,515
18
152,145
7,000 to 7,999
31
229,455
37
274,694
6,000 to 6,999
68
437,318
79
508,149
5,000 to 5,999
164
888,746
186
1,013,080
4,000 to 4,999
350
1,530,882
457
1,988,197
3,000 to 3,999
1,417
4,828,142
1,851
6,323,779
2,000 to 2,999
4,534
10,800,183
5,197
12,901,222
1,000 to 1,999
5,329
9,019,654
3,614
6,511,149
0 to 999
233
152,358
393
258,780
Military Service
63
0
51
0
No earnings
2
0
5
0
12,255
$28,572,260
[1] 11,949 $30,633,171
*195 The schedule shows the actual fixed compensation received by such employees who were on the payroll at the end of the year, and includes individuals employed during the year who did not receive a full year's pay. The following tabulation sets out separate data for 1949 with respect to such individuals: Aggregate
Salaries & Wages
Number
Fixed Com-
Paid Bracket
Employees
pensation Paid
$3,000 to $3,999
12
$ 39,071
2,000 to 2,999
90
223,159
1,000 to 1,999
127
183,530
0 to 999
179
110,725
408
$556,485
The following schedule shows fixed compensation, by-law payments, total payments and ratios for employees (including employees of Glenn) other than officers and directors by certain salary brackets: Brackets
Payments and Ratios
1949
1950
$8,000 or more
Fixed Compensation
$ 726,622
$ 837,029
By-Law Payment
413,711
420,750
Total Payments
1,140,333
1,257,779
% By-Law to fixed
56.9
50.3
% By-Law to total
36.3
33.5
$4,000-$7,999
Fixed Compensation
2,545,252
2,991,100
By-Law Payment
906,608
866,171
Total Payments
3,451,860
3,857,271
% By-Law to fixed
35.6
29.0
% By-Law to total
26.3
22.5
$3,000-$3,999
Fixed Compensation
2,258,261
2,211,559
By-Law Payment
648,326
523,336
Total Payments
2,906,587
2,734,895
% By-Law to fixed
28.7
23.7
% By-Law to total
22.3
19.1
Up to $2,999
Fixed Compensation
1,595,597
1,399,378
By-Law Payment
352,168
253,528
Total Payments
1,947,765
1,652,906
% By-Law to fixed
22.1
18.1
% By-Law to total
18.1
15.3
Total Fixed Compensation
7,125,732
7,439,066
Total By-Law Payment
2,320,813
2,063,785
Total Payments
9,446,545
9,502,851
% By-Law to fixed
32.6
27.7
% By-Law to total
24.6
21.7
*196 For the years 1949 and 1950, the officers and directors of the petitioner, 15 in number, received aggregate salaries and participation under the by-law, as follows: Aggregate
Aggregate
Salaries
Participation
Total
1949
$496,007
$463,394
[1] $959,401 1950
554,988
413,006
967,994
Total remuneration received by the officers and directors [1] *197 *198 of American, Liggett and Lorillard (and subsidiary or subsidiaries in each case) for such years was as follows: American
Liggett
Lorillard
1949
$2,254,680
$987,018
$627,015
1950
1,661,386
961,102
611,010 The above-stated total amounts received by officers and directors *199 of the petitioner and of the other tobacco companies represented, respectively, the following percentages of net sales and of earnings before income taxes: Percentage
Percentage
of Sales
of Earnings
1949
1950
1949
1950
Petitioner
.13%
.13%
1.42%
1.24%
American
.26%
.19%
2.97%
2.10%
Liggett
.18%
.18%
2.00%
1.73%
Lorillard
.41%
.36%
5.59%
4.84%
The tabulation below shows the total amounts received by certain officers of the petitioner and of the other three tobacco companies who received, in 1949 and 1950, the three highest amounts of remuneration (including any profit-sharing payments received): 1949
Petitioner
American
Liggett
Lorillard
Highest
$217,500
$460,748
$132,911
$98,246
2nd Highest
123,333
254,449
122,911
75,597
3rd Highest
104,797
[1] 254,449 (2) 122,911
58,947 (2)
1950
Highest
$210,000
$227,210
$129,975
$97,286
2nd Highest
116,500
156,292
119,975
62,507
3rd Highest
106,070
156,292 (2)
119,975
58,372 (2) The following table shows the total remuneration, as reported to the Securities and Exchange Commission, of each of the officers and directors of the petitioner and of the other three companies for 1949 and 1950, *200 and the total remuneration of the officers and directors of the petitioner if the by-law payments are excluded from their compensation: Total Compensation of Officer-Director Groups on Individual Basis
in Order of Amount Received
1949
Reynolds
Fixed Salary
Reynolds
and By-Law
Fixed
Payments
Salary
American
Liggett
Lorillard
1
$217,500
$93,750
$460,748
$132,911
$98,246
2
123,333
24,333
254,449
122,912
75,596
3
104,797
60,000
254,449
122,911
58,947
4
79,927
48,000
254,449
119,912
58,947
5
65,195
35,000
254,449
119,911
58,947
6
53,735
17,600
209,638
117,911
57,331
7
$ 48,990
$48,000
$120,000
$ 54,750
$36,000
8
47,295
14,625
50,000
54,750
31,500
9
46,470
18,750
50,000
54,750
30,400
10
40,665
32,250
50,000
32,000
28,000
11
37,049
29,500
50,000
28,800
12
30,409
29,666
50,000
25,500
13
23,278
17,833
40,000
14
20,818
12,700
40,000
15
19,940
14,000
36,000
16
32,500
17
30,000
Others Not Listed
None
One
17,998
None
93,101
Totals
$959,401
$496,007
$2,254,680
$987,018
$627,015
1950
1
$210,000
$100,000
$227,210
$129,975
$97,286
2
116,500
28,500
156,292
119,975
62,507
3
106,070
66,250
156,292
119,975
58,372
4
81,130
52,750
156,292
116,975
58,372
5
65,340
38,500
156,292
116,975
58,372
6
54,510
52,750
148,672
114,975
58,372
7
52,620
20,500
128,336
53,950
40,302
8
46,140
21,500
120,000
53,950
34,610
9
45,290
16,250
50,000
53,950
27,288
10
45,230
37,750
50,000
28,600
11
40,210
33,500
50,000
27,300
12
33,130
32,250
50,000
13
25,340
20,500
47,333
14
23,716
16,500
40,000
15
22,768
17,488
40,000
16
34,667
17
32,000
Others Not Listed
None
None
18,001
24,503
115,530
Totals
$967,994
$554,998
$1,661,387
$961,103
$611,011
*201 The highest salary received by any officer of the petitioner, exclusive of payments under the by-law, was $93,750 for 1949 and $100,000 for 1950, paid to the chairman of the board of directors of the petitioner. Petitioner's over-all policy in these respects reflected its view that it could employ and retain satisfactory supervisory and executive personnel despite its low fixed salary policy by looking to the by-law to provide additional pay for such personnel. On occasion, individuals were induced to enter into the employ of petitioner in part on the basis of the suggestion that they could purchase participating stock by which they would be able to supplement their fixed compensation. In setting a salary for a particular job and in determining raises, consideration was given to an individual's qualifications, his experience and background, to the work that was to be performed and the responsibilities that were to be assumed. An individual's basic salary, while broadly low in accordance with petitioner's over-all compensation policy, bore a definite relation, within such limits, to the job performed and the responsibilities assumed. Such fixed salary of one employee as contrasted with *202 another would thus, in general, be indicative of certain differences or similarities between their duties and responsibilities. Employees who were equally efficient and who were fulfilling equal jobs would receive, in large measure, basic compensation in approximately the same amount. Little attention was paid or consideration given to the amount of participating stock owned by employees in determining basic salaries and salary adjustments. The salary policy of the petitioner began to be liberalized in 1949. It became known at that time, as a consequence of the 1949 by-law amendment, that participation under the by-law was to be reduced commencing with 1950, and petitioner, accordingly, desired to adjust the basic salaries of the affected employees. In 1950, in addition to merit increases in salary, a modest general cost of living increase was given to most employees, including the 15.6 per cent of those employees who owned stock. No employee was refused a raise during 1949 or 1950 because of stock ownership, except in a few rather obvious and outstanding cases. During 1949 and 1950, employees, below the director group at least, occupying the same or reasonably comparable jobs, except *203 for the seniority factor, received about the same fixed compensation irrespective of whether they held participating common stock and irrespective of the amount of stock so held. The management of the petitioner was convinced that employees who owned common stock were more valuable to the petitioner by reason of such stock ownership; that they operated under an incentive resulting in greater accomplishment, harder work and more interest in the company; and that they set the pace for other employees and kept up the standards and efficiency of work. Management believed that the measure of interest and value to the company of an employee was affected by such stock ownership. Management also considered that it was justified in paying larger amounts under the by-law than it would have paid in additional fixed compensation because such payments under the by-law were contingent and dependent upon profits. Fixed compensation plus participation payments under the by-law, tested from the standpoint of amounts received by individual employees, as conceded by petitioner, exceeded by the following aggregate amounts, at least, a reasonable allowance for personal services actually rendered in the *204 business of the petitioner during the years 1949 and 1950: Aggregate Excess
1949
1950
Officers and Directors
$ None
$ None
Junior Executives and professional personnel
[1] 9,000 (1) 11,000 (2)
Sales Department personnel
25,000 (6)
10,000 (4)
General Office, Administrative and clerical
97,100 (28)
76,700 (25)
personnel
Leaf and Leaf Processing Department personnel
104,500 (22)
92,200 (23)
Manufacturing, Engineering and Service
123,300 (42)
126,900 (43)
Departments personnel
Total
$358,900 (99)
$316,800 (97)
With respect to payments made under the by-law for years prior to 1949, the petitioner did not claim deductions therefor on its income tax returns. Payments for such years were reported by the petitioner on income tax information returns as dividends. With respect to payments under the by-law for 1943 through 1948, the petitioner did not withhold and remit to the Commissioner of Internal Revenue any part of such payments as withholding taxes or employment taxes pursuant to the provisions of Subchapters A and D, Chapter 9, of the Internal Revenue Code of 1939. In its income tax return for *205 1949 and in its income and excess profits tax return for 1950, the petitioner claimed an allowance for a portion of the payments under the by-law as part of compensation of officers and a portion as part of cost of goods sold. Such payments were reported as follows on such returns: 1949
1950
In compensation of
officers
$ 437,406.75
$ 389,686.00
In cost of goods sold
2,346,799.95
2,087,104.80
With respect to distributions made under the by-laws for each of the years 1949 and 1950, such distributions having been made in January of the following year in accordance with the practice of the petitioner, the petitioner withheld and remitted to the then collector of internal revenue withholding and employment taxes pursuant to the provisions of Subchapters A and D of Chapter 9 of the Internal Revenue Code and remitted to the collector taxes under Subchapter C of such chapter. Also, with respect to payments for such years, the petitioner filed information returns reporting such by-law distribution payments as part of the compensation paid to employees participating under the by-law. The petitioner filed claims for refund of income or excess profits taxes for 1940 through 1948, based upon the ground *206 that payments under the by-law for such years were deductible in computing the net income of the petitioner, either as compensation or as an ordinary and necessary business expense or as a part of the cost of goods sold, or under a combination of these categories. Such claims for refund have been disallowed by the Commissioner of Internal Revenue and a suit thereon is now pending in the Court of Claims of the United States. The Annual Report, Form 10-K for Corporations, filed by the petitioner for 1945 with the Securities and Exchange Commission states in part: "Outside of salaries and wages paid and actual expenses reimbursed, no disbursement or credit is made to any director, officer or employee of the Company except dividends in connection with his stockholdings in the Company declared by the Board of Directors as ordinary dividends or under Article XII of the Company's By-Laws. In the Profit and Loss Statement of the Form 10-K participation payments under the by-law were reported as a deduction from income in determining the net earnings for the year. " The by-law distributions for 1949 and 1950 made to employees of petitioner constituted additional compensation payments and were *207 reasonable in amounts calculated as follows: Sums equalling the hereinafter set-forth percentage of each officer's and employee's basic salary in such years, to the extent that the by-law distribution received by each such individual in 1949 and 1950, respectively, was sufficient to cover such additional percentage of the individual's basic salary, but in no case to exceed the amount of such by-law distributions, in effect, conceded by petitioner to have been unreasonable in amount. The percentage above referred to is as follows: Officer-Director Group
Per cent
Per cent
Fixed Salary Brackets
1949
1950
90,000-100,000
80
75
80,000- 89,999
10,000- 79,999
60,000- 69,999
65
60
50,000- 59,999
40,000- 49,999
50
45
30,000- 39,999
20,000- 29,999
40
35
10,000- 19,999
Other Employees
22,000- 22,999
40
35
21,000- 21,999
20,000- 20,999
19,000- 19,999
18,000- 18,999
17,000- 17,999
16,000- 16,999
15,000- 15,999
14,000- 14,999
35
30
13,000- 13,999
12,000- 12,999
11,000- 11,999
30
25
10,000- 10,999
9,000- 9,999
25
20
8,000- 8,999
7,000- 7,999
6,000- 6,999
20
15
5,000- 5,999
4,000- 4,999
3,000- 3,999
15
10
2,000- 2,999
1,000- 1,999
10
5
0- 999 Opinion FISHER, Judge: Respondent has disallowed deductions taken by petitioner in 1949 and 1950 for distributions made *208 to certain common stock shareholders in accordance with the provisions of Article XII of its by-laws. Respondent contends that such distributions were preferential dividends. He argues that the distributions in issue were made from earnings and profits of petitioner and were based solely upon and actually made in direct proportion to stock ownership. Petitioner, on the other hand, argues first that the distributions were compensation for services rendered and, to the extent not already conceded by it to have been unreasonable in amount, that such payments represented reasonable compensation. Alternatively, petitioner argues that regardless of whether such distributions were or were not compensatory in nature and reasonable in amount, they were nevertheless ordinary and necessary business expenses. Petitioner urges a further alternative to the effect that such distributions as were made to employees engaged in the leaf buying and manufacturing operations of the petitioner and to the employees of Glenn are to be treated as part of cost of goods sold and may not be disallowed by respondent on any theory. The following are the essentials of the plan of the petitioner under which the distributions *209 here in issue were made. In 1912, petitioner first adopted a by-law to provide for the discretionary distribution of a portion of its annual profits not to exceed 10 per cent over a certain specified base to officers and other employees owning A stock, who, at the time of distribution, had been in the petitioner's employ for not less than a year before, such distribution to be in proportion to their respective A stockholdings. Thereafter, in 1915, the by-law was amended to provide further that such eligible A stock would include stock purchased from an officer or employee or from the personal representative of a deceased officer or employee, if the former owner of the stock so purchased would otherwise have been entitled to participate in the distribution. The by-law remained substantially unchanged until its further amendment in 1949. During the intervening period, the amounts of participation payable under the by-law were computed by first deducting from annual profits dividends accrued on petitioner's preferred stock, outstanding at various times, and after 1934, by deducting from the participation fund an amount equivalent to the participation payable on a certain 200,000 shares *210 held by petitioner in a retirement and insurance fund. Also, beginning with the year 1923, the by-law was applied equally to employees of petitioner's wholly-owned subsidiary Glenn. In 1949, the by-law was further amended: (1) to provide for its ultimate discontinuance by reducing the participating percentage by one point each year beginning with 1950 until 1959; (2) to specifically provide for the aforementioned deductions from annual profits in computing the amount of participation; (3) to specifically provide for the operation of the by-law with respect to Glenn employees; and (4) to limit the eligible shares to those owned throughout the year 1949 by petitioner's or Glenn's employees and such other shares as they might own on May 24, 1949. The details of these, and other provisions of the by-law as amended in 1949, are set forth in our Findings of Fact. Participating stock had generally been acquired by petitioner's employees by direct purchase from the petitioner, in the main under close supervision of the management of petitioner. However, petitioner discontinued acquiring and selling its common stock to employees after 1935, though an informal check was thereafter still made *211 by management on employee acquisitions. But such general supervision was relaxed in 1949 after the plan to terminate the operation of the by-law over the next 10 years became effective. Nevertheless it was still generally understood among the employees that they ought not to purchase stock without first consulting with their superiors. Petitioner's manner of distributing stock to its employees up to 1935 was to periodically communicate down through its supervisory personnel its proposal to make available such stock previously acquired. Supervisory personnel would line up orders for the stock and recommend a particular allotment of the stock on a selective basis, picking employees they thought ought to be encouraged to become more closely and permanently associated with the company because of their outstanding work and apparent promise for the future. Distribution was thereafter handled informally without action of the board of directors of the petitioner or of any management committee. Management would review the orders, suggest allotments and on a selective basis make various adjustments, considering the estimate of a man's promise and his financial ability to handle a greater or *212 lesser allotment. Broadly, it appears from the record that the management of petitioner was impressed with the over-all success of the operation of the by-law. They believed that the purpose thereof had been fully served over the years, that young, promising workers had been encouraged thereby to stay with petitioner and to serve the company loyally, and that such persons had effected real savings for the petitioner by their constant leadership in achieving more efficient operation. The by-law, however, has admittedly not operated perfectly since its inception. Its provisions have allowed the accumulation of disparate amounts of stock in the hands of individuals performing essentially the same functions and bearing much the same responsibilities. Such disparate holdings have come about variously as the result of inheritances or gifts, or from unauthorized purchases from other employees or in the open market. Also, various individuals have, over the years, failed to fulfill the promise they first showed at the time their stock was acquired. Such, briefly, and in broad outline, is the factual context within which the distributions here in issue were made. Compensatory Nature of the *213 Distributions Whether the corporate distributions here in issue represented, in whole or in part, additional compensation payments for which the petitioner would be entitled to a deduction or were in reality dividend distributions is a question of fact which must be answered in each case on the basis of the particular circumstances involved. Woodcliff Silk Mills, 1 B.T.A. 715 (1925)New York Talking Machine Co., 13 B.T.A. 154 (1928). Broadly, the framework within which we must consider the question is clearly stated in Woodcliff, as follows (718): "To become an allowable deduction under the statute the salary or compensation paid must have been for personal services actually rendered and must further have been reasonable in amount. Whether amounts paid constitute compensation for personal services actually rendered or are an attempt to distribute profits as salaries is, in the last analysis, a question of fact to be determined from all the evidence. United States v. Philadelphia Knitting Mills Co., 273 Fed. 657. The fact that salaries paid to its officers by a corporation are in direct proportion to the stockholdings of the respective officers is strong evidence of an intent *214 to distribute profits as salaries and must be overcome by clear evidence showing that the salaries are reasonable in amount and actually represent compensation for personal services rendered. In every case where the compensation paid is in direct proportion to stockholdings, the evidence adduced will be carefully examined and if, from the surrounding facts and circumstances, it appears that the salaries are unreasonable in amount or do not in fact represent compensation for personal services actually rendered, they will be disallowed as a deduction from gross income." Beyond this the very large number of cases cited by both petitioner and respondent reveal little more than certain general considerations which have bearing on the specific issue presented here. None, however, involves facts or circumstances sufficiently like those of the instant case to be directly in point, or even to be of particular significance or guidance to us in our consideration of the issue before us. It would serve no useful purpose to discuss or distinguish such a large group of cases which differ in so many respects from one another and from the case at hand in their various complex facts and in the particular *215 considerations applied by the Court in each. The issue here must be resolved solely upon the peculiar facts involved in petitioner's most unusual and unique plan for distributions under the by-law, hereinbefore described, giving careful attention to the principles and general considerations heretofore developed and applied by the Court. That the distributions made under the by-law have characteristics both of dividends and of compensation payments cannot be denied. Petitioner's plan was not one of stock option, stock bonus or even stock purchase, but merely involved the arrangement of a sale of A stock, up to 1935 directly from the petitioner in most cases, to selected officers and other employees. Such purchases were rarely, if ever, bargain purchases. Officers and employees who bought A stock generally paid the fair market price of such stock, or a price equal to the overall average cost per share of a block of stock when acquired from petitioner directly after prior acquisition by petitioner of a particular block of shares. Ownership of A stock was essential to participation in the allotted portion of petitioner's profits, and while such participation was not in the form of a declaration *216 of a special dividend on the eligible shares, the distribution was nonetheless made in direct proportion to the ownership of stock. On the other hand, eligibility depended not only on the ownership of stock, but also on the employment status of the individual with the petitioner at the time of distribution and for at least a year prior thereto. Stockholdings which would qualify for participation likewise were not of a single character, since there existed various sources for stock acquisition. Subsequent to the 1915 amendment and prior to the 1949 amendment, the by-law permitted participation with respect to such shares as were acquired from another officer or employee or the personal representative of a deceased officer or employee if the seller would otherwise have been entitled to participate had the stock been held for the required period, and in addition, but only with respect to such shares as had been held by the employee for a full calendar year if acquired from other sources. Thereafter, the total amount of eligible stock was in effect frozen as of May 24, 1949, to such stock as was then in the hands of officers and employees. Stock purchased on the open market was no longer *217 considered eligible, if so purchased after May 24, 1949. But for the purposes of the distribution, shares of A stock purchased by an officer or employee from other officers or employees or the personal representative of a deceased officer or employee, would constitute eligible stock and be deemed to have been owned for a full calendar year if so purchased within such year and if such officer or employee would otherwise have been entitled to participate. The plan here in issue and the over-all characteristics of petitioner's program are unique. But we think the purpose of the petitioner's plan has been sufficiently established upon the record as a whole to have been undertaken mainly as an incentive-compensation technique. We think that the distributions were compensatory in large part. The cases all indicate quite clearly that whether a distribution is compensatory in nature depends largely on the purpose for which the distribution was made and the intention of the party making such distribution. Woodcliff Silk Mills, supra; Twin City Tile & Marble Co., 6 B.T.A. 1238 (1927)., United States Steel Corporation, 2 T.C. 430 (1943). Such purpose and intention, of course, is to be gleaned *218 from the whole of the circumstances leading up to and surrounding the distributions, including the relationship of the distributions to the ownership of stock and the making of the distributions in direct proportion (or bearing a close relation) to such ownership. Such factors, however, are not fatal to nor determinative of the classification of the distribution either as dividend or compensation. We have held that while such distributions invite close scrutiny, as heretofore indicated in the above quotation from Woodcliff, they may, nevertheless, have been in reality compensation payments. See E. J. Stilwell Paper Co., 6 B.T.A. 531 (1927); New York Talking Machine Co., supra; J. J. Hart, Inc., 9 T.C. 135 (1947). See generally 4 Mertens, Law of Federal Income Taxation, secs. 25.63, 25.64 (1954). The unusual multiple characteristics of the distribution, some of which are dividend-like and others of which are compensation-like, do not stand alone in the posture of this case, and their basic quality for Federal tax purposes depends partly on petitioner's, its management's and its employees' conduct in relation thereto. Evidence thereof circumstantially reveals a certain ambivalence *219 on the part of the petitioner itself and a shifting point of view, in some instances dictated by then existing circumstances (as will be apparent from our discussion infra) up to 1949. After such time, however, petitioner's attitude as to the nature of the distribution has been constant. Management personnel and employees, on the other hand, seem always to have considered the by-law distributions in the main as compensatory. Prior to 1949, petitioner had never deducted any portion of the by-law distributions as additional salary payments. According to a letter dated December 18, 1942, from S. Clay Williams, then chairman of the board of directors of the petitioner, to the Commissioner of Internal Revenue, this was in accordance with a holding of the then Bureau of Internal Revenue to the effect that the disbursements were dividends. In its income tax return for 1936, the petitioner did not claim a dividends-paid credit under section 27 of the Revenue Act of 1937 on account of the amounts distributed for 1936 pursuant to the by-law. However, upon examination of the petitioner's 1936 return, the respondent allowed such credit and thereafter on its 1937, 1938 and 1939 returns the petitioner *220 claimed and was allowed similar credits. The resolution of the board of directors of the petitioner declaring and authorizing the payments under the by-law, for the years 1940 through 1945, referred to such distribution as a "participating dividend." On the other hand, the same resolution also declared that the distribution was "in accordance with the said By-Law" and would "serve the purposes and intentions thereof," and that if such distribution "were to be tested on the basis of reasonable and proper compensation for those receiving same, it, with salary added, would not amount to more than a reasonable and proper compensation to each of said officers and employees for the year * * *." For the years 1946 through 1948, the resolution was substantially the same as the resolution for the years 1940 through 1945, including reference to the distribution as a "participating dividend," except that the declaration of the board with respect to the reasonableness of the distribution was to the effect that the distribution "will be reasonable and proper under said by-law and will serve the purposes and intention thereof." The resolutions of the board of directors of the petitioner authorizing *221 the payments under the by-law for each of the years 1949 and 1950, were largely the same as the resolutions and procedure with respect to the authorization of payments under the by-law for the years 1946 through 1948, though the distribution was not referred to as a participating dividend, but as "a distribution to be paid from a fund" based on profits, and a specific declaration of the reasonableness of the distribution as salary was no longer contained therein, reference being made only to the effect that "said participation [is] found to be reasonable and proper under * * * the By-Laws and as serving the purposes and intentions thereof." While these various denominations of the distribution, sometimes as dividend and at the same time as compensation, and sometimes not as dividend or compensation, particularly in the years here involved, are not determinative of their character, they do, we think, reflect, in part, petitioner's lack of constancy in its attitude toward the distribution as either dividend or compensation. On the other hand, petitioner consistently has treated the by-law distribution payments as deductions in computing its annual earnings on its books, in its reports *222 to stock-holders, and in its reports to the Securities and Exchange Commission. Petitioner's employees referred to the participation payments as "the bonus," and the participating stock as "bonus stock." John C. Whitaker, chairman of the board of the petitioner, testified that all through the plant they mentioned 'the bonus,' and they knew whatever money they saved they would get a bigger bonus." It is apparent there has not been a consistent way of viewing the unique by-law distributions involved here as either additional compensation or dividends. But it is fundamental that the petitioner's conception or view of the situation, if it were erroneous at any time in the past, would not preclude it from establishing here the real nature of the distributions for tax purposes. Such viewpoints may be relevant since they may circumstantially reflect the intent of the taxpayer in making the distributions, but they are not necessarily controlling. We think the record sufficiently bears out the contention of petitioner that it was petitioner's intention at the inception of and throughout the operation of the by-law plan to encourage selected employees to invest in the stock of petitioner in *223 order that they might be more closely identified with the company and be spurred to serve the company to a greater capacity. (Such is often the purpose and effect of a stock bonus, stock purchase plan or stock option plan, each of which may likewise be compensatory in nature. [2] *224 ) The promise and performance of such individuals was rewarded by the distribution of a portion of the annual profits of the petitioner under the by-law. While the dividend-like form of the distributions cannot be ignored, we think that there are many reasons for considering some part of the distributions as (reasonable) compensation. We will try to indicate some of those which have influenced us, without assigning any one factor as determinative since our view is based on a balanced consideration of all of the record and all of the elements herein favorable to and opposite to petitioner's position. The close tying of the distributions to the past and present employment of the individual recipient (except for certain aberrations in stockholdings) is, we think, significant as an indication of petitioner's intention and purpose in setting up the by-law. See Atlas, Toward a Concept of Compensation, 2 Tax L. Rev. 85 (1946), where it is suggested that: "In all cases of compensation, the following factors may be found: (1) there is an economic or financial benefit; (2) this benefit flows from the employer to the employee; and (3) similar benefits are not available on similar terms to any but employees. "These three factors may demonstate themselves in a variety of ways. Benefits may be conferred upon employees to induce a proprietary interest, or a greater or continued interest in the business, or to induce greater or continued effort on behalf of the business; *225 or to interest a potential employee to come or to remain with the firm; or to reward an employee for past services, or to give efficient employees an opportunity to buy into the business, or to make it of interest for an employee to supply the firm with a particular service or process." See also Commissioner v. LoBue, 351 U.S. 243 (May 28, 1956). The by-law at all times required that the participant be employed by the petitioner at the time of distribution and that he had been so employed for at least a year prior thereto. It is true, however, that at all times prior to 1949, if such condition was met the employee might participate on the basis of virtually any A stockholdings, no matter what the source of acquisition. The 1949 amendment limited stock eligibility somewhat by freezing, as of May 24, 1949, the stock which would be eligible. Such stock was limited to that then in the hands of petitioner's officers and other employees. Thereafter employees might increase their eligible stockholdings by purchasing additional stock only from other officers or employees or the personal representative of deceased officers or employees if the latter would otherwise have been eligible to participate. *226 (Petitioner had ceased to sell stock directly to its officers and employees in 1935.) Thus, while employment was a necessary condition to participating in the by-law distribution, such participation would occur with respect to stockholdings not necessarily acquired by the participant in direct relation to his job position and job responsibilities. But to the extent that such holdings did accord with the employee's job position and responsibility, particularly if acquired at the direction of and under the general supervision of the petitioner for the purposes contended for and with a view to a fair allotment of stockholdings commensurate with his position and responsibility, we see no reason why distributions, though keyed to stockholdings, may not be deemed compensatory. (The question of reasonableness is considered infra.) In addition to the required employment relationship, it is, we think, particularly significant that petitioner on the whole maintained over-all relatively low fixed salaries. This is quite apparent from a comparison with the fixed salary scales of petitioner's competitors. (Hourly wage rates were maintained at the community level.) The petitioner was nevertheless *227 able to employ and retain satisfactory supervisory and executive personnel, in large part, by reason of the operation of the by-law through which the opportunity to enhance income was afforded. See Albert Russel Erskine, 26 B.T.A. 147 (1932). Such view is further supported by the change necessitated in petitioner's over-all salary policy in 1949 following amendmnt of the by-law to provide for the gradual cessation of its operation over the next ten years. Petitioner began at that time to correct its basic salary scales to substitute for the diminishing supplemental income theretofore received from the by-law distributions and also to bring its salaries more in line with the market generally and thereby eliminate inequities that crept into the system over the years. It is likewise significant in determining whether payments to stockholder-employees are compensation or dividends to consider the taxpayer's dividend record. A payment of substantial dividends to all of a taxpayer's stockholders qua stockholders is indicative of the compensatory nature of additional payments confined to stockholder-employees. See Mayson Manufacturing Co. v. Commissioner, (C.A. 6, 1949) 178 Fed. (2d) 115. *228 Petitioner paid regular dividends of $19,660,886 on its common stocks in 1949 and $19,714,748 in 1950. From 1912 through 1950 the petitioner paid regular dividends on its common stocks amounting to $641,901,884. For the entire period the dividends amounted to almost nine times the amount of the participation payments, and for the years in question they amounted to seven or eight times the participation payments. We think the payment of such substantial dividends to all of the petitioner's stockholders tends to reveal the character of the additional payments made to petitioner's stockholder-employees, even though based on such stockholdings, as compensatory in nature rather than dividend-like. We view this factor as indicative of compensation payments when considered in conjunction with and as a part of the entire factual picture here before us. In sum, the payments made to petitioner's employees under a plan, the origin and history of which indicate an attempt to further compensate worthy employees and to thereby secure their continued loyalty and efficient efforts, which plan has been largely successful and has contributed materially to the success of the petitioner, are to be considered *229 compensatory in nature and deductible to the extent that they are demonstrated to be reasonable in amount. The plan here was an integral part of the petitioner's policy of paying low, fixed salaries. The dividend payments to all shareholders throughout this period were unbroken and were substantial. The bonus payments benefited only employees. The participating stock constituted only a very small percentage of the total outstanding common stock (of both classes) in the years in question. The officer-directors group's holdings of both participating and other common stock during these years were only 1.5 per cent of such total. There is no evidence of an intention to avoid tax. Thus, despite the existence of a distribution formula based on stock ownership, the bonus payments are to be treated in the nature of additional compensation. We hold that some part of the distributions in issue constituted compensation to the recipients and to such extent is deductible by the petitioner. Reasonableness of Compensation Distributions We come then to the practical difficulty of determining, upon the record before us, what portion of such distributions represents reasonable compensation for services *230 rendered. That the total sum of the distributions does not represent fair and reasonable additional compensation is apparent from the foregoing discussion. Petitioner itself has conceded that a certain portion of the distributions, when considered in conjunction with various individuals' fixed salary plus participation payments was unreasonable compensation for the services being rendered to petitioner by those individuals. The stockholdings of petitioner's employees were acquired over the years in a rather haphazard way and from various sources. While they were acquired in the main directly from the petitioner and under the control and supervision of the petitioner up to 1935, thereafter no stock was sold by petitioner to its employees and the management supervision over the acquisition of A stock by employees was somewhat lessened and became largely informal. Where, under the direct supervision of the management of the petitioner, stock was allotted to selected employees on the basis of past and prospective service and value to the company. But even then, individuals were able to purchase A stock on the open market without management approval or supervision, and some did so. Some *231 also purchased stock from other employees or from the personal representative of deceased employees, likewise without the scope of management direction. Some received gifts of participating stock or inherited such stock. Perhaps even more important than the various manners in which the stockholdings were acquired, however, is the fact that some of those to whom stock was allotted did not finally measure up to the promise they had shown earlier. Some are presently performing services which do not warrant the large amounts of participation to which they are entitled under the by-law. These circumstances point clearly to the conclusion that only a part of the distributions here in issue may be considered as fair and reasonable compensation in addition to fixed salaries for services rendered. Petitioner urges that since the statutory notice of deficiency disallowed in toto the deduction by the petitioner of the amount of the 1949 and 1950 by-law distributions and did not assign as a separate ground for such disallowance the unreasonableness of any portion of the distributions, such question is not an issue in this proceeding, or, if it is an issue, that respondent has the burden of proof *232 in respect thereof, or that petitioner has a lessor burden with respect thereto than it would otherwise be required to sustain. We think it clear that the disallowance of the entire deduction placed the burden of proof upon petitioner to prove to what extent, if at all, it was entitled to such deduction. To the extent that petitioner relies upon the deduction on the theory that it represents compensation to officers and employees, it is equally clear that the element of reasonableness is inherent, and must be established by petitioner if we are to find in its favor in whole or in part. See Meldrum & Fewsmith, Inc., 20 T.C. 790, 804 (1953). We hold that petitioner has the burden of proof with respect to the issue of reasonableness and that such burden has neither been shifted to respondent nor been lessened in degree as a consequence of respondent's general disallowance and determination instead of a detailed specification of his various grounds for disallowance. We may add that it is clear from the record that petitioner has not been surprised, delayed or hindered in any way in presentation of its proof, and has conducted its case throughout in apparent recognition of its burden. *233 J. J. Hart, Inc., 9 T.C. 135 (1947). Petitioner has introduced a substantial amount of evidence bearing on the reasonableness of the amounts of the by-law distributions when considered as additional compensation, but has not shown in any detail the nature and responsibilities of each specific job being performed or the value of such job in terms of salary therefor, either fixed or contingent. Petitioner urges that such failure should not bear heavily against it, since it would be an extremely burdensome task, if practicable at all, to introduce such evidence in respect of some 1,800 or more positions. While we recognize petitioner's difficulty, we likewise must point out that we must take the record as we find it, which has necessitated our approach to the issue and to the only kind of determination which we may appropriately make under the circumstances. Petitioner has submitted much data comparing itself with its three competitors, American, Liggett and Lorillard. All three of petitioner's competitors have had profitsharing plans since 1912. The main differences between these plans and the one before us are that petitioner's plan provided for distributions to general employees *234 as well as officers, which the others did not, and that petitioner's distribution, unlike the others, was based on stockholdings. For 1949 and 1950 participation in petitioner's profits by qualified employees was slightly less than 7.5 per cent of the profits in excess of a $5,153,000 base for 1949, and about 6.5 per cent for 1950. Of such share of the profits, petitioner's officer and director group received 16.64 per cent in 1949 and 16.68 per cent in 1950, amounting to 1.22 per cent of the profits in excess of the base for 1949 and 1.10 per cent for 1950 for the group of the 15 senior executives. The other participating employees, 1,891 for 1949 and 1,859 for 1950, received 6.13 per cent of the profits in excess of the base for 1949, and 5.45 per cent for 1950. For 1949 and 1950, American distributed 5 per cent of profits over the base figure to its president and five vice presidents. Liggett distributed 2 1/2 per cent of the defined profits to its president and vice presidents. Lorillard distributed 10 per cent of its profits, 1 per cent to its president,.8 per cent to its executive vice president,.6 per cent to each of its other vice presidents, and 5.8 per cent to its other officers *235 and key employees as its board might determine. The amount of by-law distribution paid to petitioner's entire officer and director group was about one-fourth of the by-law payments made by American to six of its officers, one-half of the by-law payments made by Liggett to its officer group, and less than one-third of the amount paid by Lorillard to its officer group. The amount paid under the petitioner's by-law to its 15 officers and directors was $463,394.25 for 1949 and $413,006 for 1950. American on the other hand, paid $1,318.180.25 to its president and five vice presidents for 1949 and $709,386.93 to the same officers for 1950, after a voluntary reduction of $497,408.77 in the amount they were entitled to receive for that year. For 1949, the 1,891 other employees participating under the by-law of the petitioner received $2,320,812.45 and for 1950 the 1,859 other employees received $2,063,784.80. (The numbers of employees and amounts of compensation paid include 14 employees of Glenn for each year, who received a total of $47,767.50 for 1949 and $50,754 for 1950.) Overall, petitioner's officers and directors received a relatively smaller percentage of its profits under the by-law *236 than the officer-director groups of the three competing companies. The total officer-director remuneration for 1949 paid by petitioner was less than half of that paid by American, and for 1950 slightly more than half. The petitioner's total for each of those years was approximately equal to that paid by Liggett to its smaller group and approximately 50 per cent more in each year than Lorillard paid. The amount of total compensation paid by the petitioner to its officers and directors was likewise somewhat conservative as compared to the payments made by American, was on a close parity with such payments made by Liggett, and exceeded only those made by Lorillard. The petitioner's total payments amounted to.13 per cent of its sales both in 1949 and 1950, compared to Lorillard's payments amounting to.41 per cent of its sales in 1949 and.36 per cent of its sales in 1950. The percentage ratios of these payments to the earnings before taxes on income of the respective companies were, in the petitioner's case, 1.42 per cent for 1949 and 1.24 per cent for 1950, while in Lorillard's case they were 5.59 per cent for 1949 and 4.84 per cent for 1950. The same percentage ratios of the petitioner *237 were also lower than the corresponding percentage ratios for American and Liggett. The fixed salaries paid by the petitioner to its officers and directors included the highest salary paid to the chairman of the board in the amounts of $93,750 in 1949 and $100,000 in 1950. In 1949, only three others received as much as $48,000 a year each; and in 1950 three others received $52,750 or more each. The remainder of the 15 officers and directors in 1949 received fixed salaries ranging from a low of $12,700 to a high of $35,000, and in 1950 from a low of $16,250 to a high of $38,500. By contrast, in the case of American, the most nearly comparable company in volume of sales and amount of profits, 10 officers and directors received fixed salaries of $50,000 each in 1949 and two received $120,000 each. The remaining few ranged from a low of $30,000 to a high of $40,000. The president of American received a $120,000 salary and a $340,747.72 bonus, or a total of $460,747.72, which is almost equivalent to the total of $496,007 received in fixed salaries by all of the petitioner's 15 officers and directors. For 1950, 12 of the officers and directors of American received fixed salaries of $50,000 *238 or more each, one of which was $120,000. (The other officer who received a like sum in 1949 died in 1950.) The remainder of that company's officers and directors received salaries ranging from a minimum of $32,000 to a maximum of $47,333. The substance of the data submitted by petitioner bears partly on the difference between petitioner's total wage bill and that of its competitors, but mainly so in relation to the officer-director group, and tends to demonstrate that such total wage bill, including the distribution payments, in whole or in respect at least of the officer-director group, was not unreasonable in amount. But though such data may establish the over-all reasonableness of the petitioner's total wage bill, at least for its officer-director group, it does not go far enough, we think. This method is not adequate to establish in any degree the reasonableness of any particular individual's salary among all employees or even the officer-director group. A total wage bill which seems reasonable as such, even in part, may include overpayments to particular employees, but nevertheless be reasonable in total amount because of the underpayment of other employees. The latter circumstance *239 is, of course, of no concern to us, since particular compensation payments which are excessive in amount may be disallowed even if by a concurrent underpayment of another employee the taxpayer happens to pay a total reasonable amount in the form of salary and other compensation. L. Schepp Co., 25 B.T.A. 419 (1932). Thus the evidence submitted in this respect is not alone sufficient to support petitioner's view, although we think it is entitled to consideration as a part of the whole picture. Individual comparisons could conceivably be made only with respect to the officer-director group, but even in that regard the evidence is meager when considered from a point of view other than the total wage bill for such group. There is nothing in the record as to what the specific duties and responsibilities are of individual officers of any of the three competitors. We can give consideration to it in our determination only so far as it goes. Petitioner would next have us resolve this issue by crediting the testimony of several of petitioner's executives, who allegedly were familiar with the circumstances of each case of an officer or employee entitled to participate in the by-law distribution, *240 to the effect that they variously had examined each such situation, either personally or by consulting with others in their respective departments, and had concluded that, except for those amounts heretofore conceded to have been unreasonable, all amounts paid were no more than reasonable compensation. We have carefully studied this testimony and believe it is insufficient to establish that each of the petitioner's employees who participated in the distributions was in fact receiving reasonable compensation for his services. The testimony does not reflect, either in part or in toto, the kind of thorough analysis of the job being performed by each individual, the adequacy of such individual's performance thereof and the relation of each such job with comparable positions, necessary to objectively evaluate fair compensation therefor. Moreover, the cross examination revealed quite clearly that persons (other than those conceded to have received unreasonable compensation) performing essentially the same jobs with relatively the same degree of efficiency and bearing a like responsibility were in fact receiving different amounts of salary and participation and that there was no adequate *241 explanation for such circumstance. None of the witnesses could satisfactorily differentiate among these persons and their jobs for the purpose of justifying their respective salaries. We think the basis hereinafter outlined for determining a reasonable allowance for salary from the distributions more closely reflects the differences in individual situations and serves to adequately differentiate the various jobs. Petitioner argues that management would consider an employee's stockholdings in setting his fixed salary and would account for such by fixing a somewhat lower salary base for the employee who owned a substantial amount of A stock and a somewhat higher salary base for the employee with lesser A stockholdings. We do not think such contention is borne out by the record. The situation is rather incongruous. Petitioner urges that those employees who were most valuable to it were those who owned the greater amount of stock because they were the ones who evidently had the interest of the company "at heart." Yet it would be this very group that would have to constantly look to the participation under the by-law for their just reward while the others would be secured and guaranteed *242 a relatively higher minimum wage. We think that little consideration was given to the amount of stockholdings of an employee when questions were raised respecting the determination of his basic salary. Not a single one of petitioner's witnesses described a specific case in which this occurred or demonstrated precisely the manner in which and the extent to which one employee's basic fixed salary was depressed as a consequence of and on the basis of his stockholdings, if compared with another employee who performed the same service with the same degree of proficiency and responsibility, but who did not possess a substantial number of shares of A stock. To the contrary, respondent's cross-examination pointed up a number of instances in which increases in salary were approved between 1949 and 1950 for such individuals who owned relatively more stock. Also, petitioner's management was hard pressed to explain by what process they were able to make the judgments necessary to fairly take account of relative differences in stockholdings when confronted with various cases of persons apparently of equal ability, performing comparable jobs with seemingly equal efficiency, each receiving the same *243 basic salary. We think the relatively low, fixed salaries overall maintained by petitioner were determined in the main uniformly to accord with the particular job, the responsibilities to be borne and the individual performance of each worker, and that the fixed salary scale basically comports more closely with a standardized and uniform objective evaluation of compensation for each job being performed, and also accords with the individual performance of each employee. In a word, all of the criteria generally considered by employers in establishing a fixed salary for particular individuals, and in differentiating one employee from another, are reflected, we think, in the basic fixed salaries of petitioner's employees, set in the sound judgment of the petitioner's management and without a view to any particular tax consequences. For these reasons the fixed salary scale seems to us more relevant to the issue than anything else before us, and a more satisfactory and realistic base from which to start in determining the portion of the by-law distributions which constitute compensation. Having in mind the principle of Cohan v. Commissioner, (C.A. 2, 1930) 39 Fed. (2d) 540, and in the exercise *244 of our best judgment, we think that the formula set forth in our Findings of Fact represents a fair and reasonable means for determining the amounts of distribution to be considered as additional compensation and deductible by petitioner on the record before us. We hold that petitioner is entitled to deduct as additional compensation payments, in each of the years 1949 and 1950, the sum of amounts equaling a set percentage (as hereinbefore set forth by salary brackets in our Findings of Fact) of each officer's and employee's basic salary in such years, to the extent that the by-law distribution received by each such individual in 1949 and 1950, respectively, was sufficient to cover such additional percentage of the individual's basic salary. On the other hand, in those cases in which petitioner has itself conceded that a particular portion of the by-law distribution received was unreasonable in amount, we allow nothing in excess of the amount which petitioner itself has considered to be reasonable. Under all of the circumstances, we think that the formula which we have adopted is a practical means for determining the amounts of distribution payments to be allowed and deducted as additional *245 compensation, keeping in mind that in applying the principles of Cohan v. Commissioner, supra, we must resolve any doubts against petitioner. We add that it is obvious, also, that application of these percentages alone to various individual's fixed salaries will result in a potential total salary and participation allowance in some instances which is greater in amount than the sum in fact received. But it is just such a vagary which tends to confirm the appropriateness of the approach here followed in dealing with petitioner's plan since it was the nature of the plan itself which resulted in the aberrations heretofore discussed, yielding at times under our formula substantial amounts of potentially reasonable compensation in excess of that actually paid, and in other instances much less than actually paid. What we have attempted to accomplish by our formula is to fairly reflect in accordance with and on the basis of the participating employees' fixed salaries those factors which need to be reflected in the additional compensation payment and are not-reflected already in the setting of the basic salary. The formula percentages, therefore, are first broken down between the two groups, *246 (1) officers and directors, and (2) other employees. This basic division tends, we think, to recognize the general tendency of incentive-compensation programs at the executive level to reward the considerably greater importance of leadership at that level and the relatively greater impact upon increased corporate earnings of such leadership. All percentage figures have also been selected to reflect the contingent nature of the additional compensation and to allow a relatively larger payment than would otherwise have been paid as fixed compensation. We think the formula likewise makes due allowance for any value to the company of ownership of stock per se as urged by petitioner. The reduction in percentage allowance for 1950 tends, we think, to correct for the increases in basic salary for that year, made in accordance with petitioner's change in salary policy necessitated by the prospective termination of the by-law. It is expected that the parties will have no difficulty stipulating the amounts to be allowed under our formula and that such will be reflected in the Rule 50 computation to be submitted. Distributions as Ordinary and Necessary Expenses Petitioner argues that if there *247 is doubt that the distribution payments were compensation for services, there is no doubt that they were expenses incurred and paid in the conduct of the petitioner's business, admitting, however, that the "line between [the] category of business expense called 'compensation for services' and other categories of business expense is at best obscure." The essence of petitioner's position lies in its view that the standard of reasonableness, applicable to compensation by specific statutory language, when applied to ordinary and necessary expenses is "governed by broader standards." Petitioner argues that for the purposes of the instant case "the fundamental distinction between compensation and business expenses in so far as the test of reasonableness is concerned" is that from the latter point of view it is the reasonableness "of the company's total outlay in relation to the benefits derived from the employees as a result of such outlay" that must be considered rather than "the amount of consideration received by individual employees in relation to the services rendered by each of them." Petitioner relies mainly on the Lincoln Electric litigation, [3] which, we think, involved a significantly *248 different situation and does not support the view here urged by petitioner. There, during 1940 and 1941 the taxpayer made payments on premiums for an employees' retirement annuity policy taken out in 1936. In 1941, it also paid $1,000,000 into a profit-sharing trust created in that year for the benefit of some of its employees. Neither the employees nor the beneficiaries were informed of thir respective shares under the annuity policy or the trust and, therefore, none of the employees included in his taxable income any portion thereof. We first held that the payments were not compensation "paid" because the employees had not received anything and their rights were too uncertain to be deemed vested. Moreover, we considered that the payments were made without any prior understanding between the company and the employees. We concluded that the payments were not ordinary and necessary business *249 expenses nor a part of the cost of goods sold. The Court of Appeals for the sixth circuit, after reviewing the purpose and favorable results of the incentive plan, as shown by the history of the company, reversed, holding: (1) the payments were clearly "expenses" because they were irrevocably paid out by the company; (2) the payments were "necessary" in the sense that they were appropriate and helpful in retaining efficient employees; (3) the payments were "ordinary" because in the light of known business practice they constituted a usual method of inspiring employees to greater effort; and (4) the payments were not too illusory or uncertain, even though the employees were not informed as to what each would ultimately receive. The Court stated that it was unnecessary to pass on the compensation or cost of goods sold questions, and that the question of reasonableness was "concededly within the exclusive province of the Tax Court," which issue having not been considered by the Tax Court, was not before the Court of Appeals. On remand we interpreted the reversal as indicating that the question of reasonableness was irrelevant where deductions are allowable as ordinary and necessary business *250 expenses as opposed to compensation and allowed the deductions in full. The Court of Appeals thereafter ruled that while the express statutory limitation of reasonableness, applicable to compensation for personal services actualy rendered, did not apply to payments which were business expenses and merely compensatory in nature, "the element of reasonableness" is nevertheless "inherent in the phrase 'ordinary and necessary,'" and "it was not the intention of Congress to automatically allow as deductions operating expenses incurred or paid by the taxpayer in an unlimited amount." Petitioner appears to concede, on the basis of this litigation, that at least for the purposes of this proceeding, the reasonableness of the distributions in relation to the purpose for which they were made must be considered in determining the ordinariness and necessariness of the expense, but argues that rather than examining the reasonableness of the compensation of each employee, the Court should consider only the reasonableness of the total deduction for "operating expenses" of the petitioner. That is, the Court should look at it from the point of view of the company's total outlay in relation to the benefits *251 received from the employees as a result of such outlay, rather than from the point of view of the amount of consideration received by individual employees in relation to the services rendered by each of them. We think it is apparent from the foregoing explanation of the Lincoln Electric litigation that neither this Court nor the Court of Appeals was concerned with the problem the petitioner here poses. None of the payments there were made directly to the employees. Consequently there would be no way in which to consider the reasonableness thereof as additional compensation or as an ordinary and necessary expense on some individual basis, for example, on the basis of the relation of the possible distribution from the trust fund in later years to the recipient's salary, since the amount of the distribution could not be known. Moreover, such distribution in later years was not in issue. Only the current contribution to the trust fund was in issue and such contribution was necessarily a lump sum and did not necessarily have to bear a particular relation to the trust fund beneficiaries' salaries to be reasonable in amount when considered as an ordinary and necessary expense. The various *252 other cases cited by petitioner are distinguishable on like grounds and need not be discussed specifically. It is clear, we think, that in the circumstances of this case petitioner can be entitled to no greater deduction for additional compensation on the ground that the distributions constituted ordinary and necessary expenses under section 23(a) than it is so entitled to when the distributions are considered as additional compensation and allowed as a deduction to the extent that they are reasonable in amount. Cf. Weather-Seal Manufacturing Co., 16 T.C. 1312 (1951), affd. per curiam (C.A. 6, 1952) 199 Fed. (2d) 376 (discussed infra). There can be no doubt that the reasonableness of an expense may be considered in determining its ordinariness and necessariness and we do not think that the standard of reasonableness when dealing with expenses which are compensatory in nature is any different whether the expense be considered specifically as compensation under section 23(a)(1)(A) or as a general business expense under the same section. The Internal Revenue Code is not so inartfully drawn that a single expenditure by a taxpayer may have a chameleon nature which affects the extent *253 of deductibility on the basis only of its label as a business expense or specifically as a business expense for compensation. No matter what the label, the deduction therefor is authorized under but a single Code section, and the character of the expenditure is likewise unitary. We have already determined the extent to which the expenditure constituted reasonable additional compensation and we find no justification for considering any amount in excess thereof as nevertheless a deductible business expense, ordinary and necessary to the conduct of petitioner's business. Treatment of Distributions as Part of Cost of Goods Sold Petitioner's last alternative contention is to the effect that at least that portion of the distributions here in question made to employees engaged in its leaf buying and manufacturing operations and to employees of Glenn is to be treated as part of its cost of goods sold, and if so treated, that no part thereof may be disallowed by the respondent on any ground. Petitioner now concedes that it was improper to include in its cost of goods sold for the years in question that portion of the payments made to employees engaged in its administrative, selling and advertising *254 operations. Petitioner also concedes that the record does not contain the necessary data upon which it would be possible to segregate from such payments the portion thereof made to construction and maintenance employees, which amounts might properly be includible in determining the petitioner's cost of goods sold. Consequently, petitioner does not urge any consideration of such portion of the payments in this phase of the argument. The only amounts in question, therefore, are those paid to employees engaged in the leaf buying and manufacturing operations of the petitioner and those amounts paid to the employees of Glenn, as follows: 1949
1950
Leaf buying and manu-
facturing operations
$1,155,419.10
$1,029,529.60
Glenn Tobacco Co. em-
ployers
47,767.50
50,754.00
We will consider first whether that part of the by-law distribution payments made to petitioner's employees engaged in its own leaf buying and manufacturing operations may be allowed as a subtraction from gross sales as part of cost of goods sold in computing gross profit. We will then consider petitioner's argument regarding the payments made to the employees of Glenn, petitioner's wholly-owned subsidiary, and includibility thereof *255 as part of petitioner's cost of goods sold. Petitioner argues that in the case of a taxpayer engaged in manufacturing and selling merchandise, it is well recognized that expenditures for materials and labor incurred in the manufacturing process yielding merchantable goods are to be treated as a part of cost of goods sold, and that as payments made to its employees engaged in its leaf buying and manufacturing operations, whether such payments are considered as compensation or otherwise as ordinary and necessary expenses, the by-law distributions were incurred in producing the finished product for sale and constituted a proper element of cost of goods sold. Petitioner contends that it is not proper to disallow such portion of the by-law distribution payments as are properly to be treated as part of its cost of goods sold even if such payments were excessive in amount when considered as compensation, since the income tax may not constitutionally be imposed upon gross receipts prior to deduction for cost of goods sold without apportionment on the basis of population, relying on Lela Sullenger, 11 T.C. 1076 (1948). Petitioner recognizes, however, the probable applicability to the instant *256 case of our holding in Weather-Seal Manufacturing Co., 16 T.C. 1312 (1951), affd. per curiam (C.A. 6, 1952) 199 Fed. (2d) 376, to be opposite to its view here advanced, and argues that our decision in Weather-Seal was incorrect and should not here be followed. In Weather-Seal certain wage and salary payments made by the taxpayer had been made in violation of wartime regulations restricting salary increases and wage adjustments. The National War Labor Board, having jurisdiction, in accordance with the then extent executive orders and rules and regulations promulgated thereunder, certified to the Commissioner of Internal Revenue that the sum of $5,000, a portion of the amount illegally paid by the taxpayer, be disallowed in calculating the taxpayer's costs and deductions for Federal income tax purposes. The Commissioner thereafter disallowed such amount and the taxpayer, upon petitioner to this Court, argued that the deduction therefor was not claimed under section 23(a)(1)(A) for the purpose of computing net income, but instead was considered as a part of its cost of goods sold to be subtracted from its gross receipts in arriving at its gross income. Petitioner contended that such *257 was necessary in order that it might secure a return of capital and that its view precluded any consideration of the amount as a section 23 deduction. The taxpayer's position was that being an element of cost of goods sold no disallowance thereof was permissible on any ground, since a disallowance thereof would result in a tax on capital which may not be imposed without apportionment. The sums involved were wages and salaries paid to employees engaged solely in a phase of the taxpayer's manufacturing operation. We held that the governmental wage and salary restrictions had the effect in this case of declaring as a matter of law that the payments certified by the National War Labor Board to the Commissioner of Internal Revenue to have been illegally made and to be disregarded as expenses or deductions for Federal income tax purposes were amounts of unreasonable compensation under section 23(a)(1)(A), and we concluded that such payments were not deductible as business expenses because they did not constitute reasonable compensation. We think that the rule of Weather-Seal is here applicable, and after careful reconsideration thereof in view of petitioner's argument, we adhere to our holding *258 therein for the reasons there expressed (p. 1319) as follows: "We regard as unsound the petitioner's major premise that the item of wages involved constitutes a part of its capital cost which is inviolable for income tax purposes and that therefore such wages may not be properly regarded, for any reason, as falling in the category of a deduction subject to question as to whether allowable or disallowable under section 23(a)(1)(A), supra. It is true that on the tax return forms, and also for general accounting purposes, direct labor costs are treated as a part of the cost of goods sold in calculating gross receipts from a trade or business while other wages and salaries paid or incurred are treated as a business expense deduction. However, the fact remains that both types of payments constitute compensation for personal services rendered which under the Internal Revenue Code, may be allowed as a deduction in computing taxable net income only if reasonable in amount. The end result is the same whether the expense for compensation paid or incurred is taken into account in one schedule on the return as part of the cost of goods sold or in another schedule as a separate deduction, namely, *259 net income is thereby reduced; and it would be wholly unrealistic to say that the former may not be questioned as to reasonableness of amount while the latter may be. The use of an unreasonable amount as wages at either place on the return would result in an unrealistic net income, for tax purposes. Furthermore, the label 'cost of goods sold' is not so sacrosanct that the items contained therein may not be questioned in arriving at correct net income as distinguished from a return of capital. In the recent case of American Pitch Pine Export Co. v. Commissioner ( C.A. 5, 1951), 188 Fed. (2d) 721, affirming a Memorandum Opinion [8 TCM 976], it was held that an actual inventory available after the close of the taxable year and prior to the filing of the return, should be used in place of a smaller estimated inventory of the number of board feet of lumber on hand as reported on the return, because the latter 'increased the cost of goods sold * * * and reduced taxpayer's income from sales.' Thus in that case an item included in the cost of goods sold was questioned and modified so as to correctly reflect income. In Majestic Securities Corporation v. Commissioner, 120 Fed. (2d) 12, affirming *260 42 B.T.A. 698, it was held that while the amount paid for the acquisition of property is usually regarded as the cost for computing income derived from a sale thereof, nevertheless, the amount paid is not conclusive as to the actual cost for tax purposes and further held that an amount smaller than that paid may be properly determined as cost basis to correctly reflect income." We think it evident that the circumstances involved in the Weather-Seal case are analogous to those of the present case in all essential respects. The payments in each were made only to employees engaged in the respective taxpayers' manufacturing operations, and in each the payments were to a certain extent considered to be unreasonable amounts of compensation, in Weather-Seal as a consequence of their illegality and certification thereof by appropriate authority to the Commissioner of Internal Revenue, and in the instant case as a consequence of our determination herein on the first and second issues. The different bases for finding that portions of the payments made by the taxpayers were unreasonable does not serve in our mind to distinguish the instant case from Weather-Seal in principle. As we pointed *261 out in Weather-Seal the payments, whether considered as a deduction under 23(a)(1)(A) or as a labor cost to be treated as part of the cost of goods sold, constituted in essence compensation for personal services rendered and might be disallowed as a deduction in computing taxable net income to the extent that they were unreasonable in amount. Thus, to the extent that the by-law distribution payments, specifically here in issue under this phase of the argument, have heretofore been determined not to constitute amounts of reasonable compensation, we hold that they have been properly disallowed whether considered as section 23 deductions or an element of cost of goods sold. Petitioner's reliance on the Sullenger decision is essentially the same as that of the taxpayer in Weather-Seal, and we think our disposition of Sullenger in that case is sufficient for the purposes of this case. In distinguishing Sullenger we there said (pp. 1319, 1320): "The petitioner relies on Lela Sullenger, 11 T.C. 1076, (petition for review dismissed C.A. 5, February 20, 1950), as apposite. There, the taxpayer claimed the excess paid over O.P.A. price for meat as part of the cost of goods sold to arrive at *262 gross income and not as a deduction in computing net income. In deciding in favor of the taxpayer this Court said, inter alia, at page 1077: "* * * Section 23 makes no provision for the cost of goods sold, but the Commissioner has always recognized, as indeed he must to stay within the Constitution, that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income. No more than gross income can be subjected to income tax upon any theory. * * * No authority has been cited for denying to this taxpayer the cost of goods sold in computing his profit, which profit alone is gross income for income tax purposes. It is unnecessary to discuss cases involving deductions, since this case does not involve any deduction. * * * "The Sullenger case, supra, is distinguished from the instant case on both the facts and the law involved and is therefore not apposite. There, the item of cost of goods sold involved the purchase price paid for property acquired which price or cost may have been properly questioned and redetermined as to amount for tax purposes under the principle announced in the Majestic Securities case, supra, but was not) and, further, no authority was *263 found to deny the taxpayer the use of its actual cost despite the fact that the portion thereof in controversy was paid in contravention of the O.P.A. price. In other words, the amount there involved was not allowed as a deduction under section 23, but was the amount paid for meat and so allowed as a subtraction under section 113 in computing gain or loss from the later sale of the meat. Here, the item involved is wages which although referred to as part of the cost of goods sold nevertheless constitutes compensation for personal services rendered and as such is specifically dealt with as a business expense deduction under section 23, supra, and, further, as hereinbefore set out, there is a law directing the disallowance of those wages as an expense." We turn then to the second phase of this argument regarding such payments as were made to the employees of Glenn, which payments petitioner also urges be considered as a part of its cost of goods sold. Since 1923, following the incorporation of Glenn, petitioner has made by-law payments to the employees of Glenn. Coverage of such employees under the terms of the by-law was not specifically provided for however until 1949 when the by-law *264 was amended to so provide. Glenn is petitioner's wholly-owned subsidiary and engages only in buying leaf tobacco in foreign countries for the petitioner to be used in the manufacture of petitioner's cigarette and other tobacco products. These foreign tobaccos purchased by Glenn are invoiced to the petitioner at a unit price, estimated to include all of the subsidiary's costs, including its employees' salaries, plus a fixed profit. In essence, petitioner contends that the amounts of the distribution payments made to the employees of Glenn, a taxpayer separate from petitioner, constitute part of the contract price paid by petitioner to its subsidiary for the foreign leaf tobaccos purchased by the subsidiary on behalf of petitioner, that it is immaterial such payments were made to the employees of a taxpayer other than petitioner, and that it is also immaterial that such payments were made directly to the employees of Glenn instead of first being made to Glenn as an additional payment of purchase price for the tobacco and then distributed by Glenn to its own employees. The issue is two-fold: first, to the extent that the by-law distributions represent unreasonable compensation by the *265 standard set forth earlier may they nevertheless be considered as a part of petitioner's cost of goods sold; and second, to the extent the payments to the Glenn employees were reasonable in amount under our standard, are they deductible as a part of petitioner's cost of goods sold in the computation of net income. The first question is really the same as that heretofore discussed with respect to such amounts paid by petitioner under the by-law to its own employees. We have held that such amounts are not free of the restriction of reasonableness and such amounts can be no more deductible as a part of the taxpayer's cost of goods sold when made to employees of another than they could be if made to the taxpayer's own employees. With respect to any such portion of the by-law distribution payments made to the Glenn employees which would be unreasonable in amount under the standard we have already set forth, our adherence heretofore to the rule in Weather Seal is dispositive and no such amounts are deductible by petitioner. We come then to consider whether petitioner may deduct any part of the by-law distribution payments made to employees of another taxpayer, even if reasonable in amount. *266 Respondent has determined that even such amounts are not deductible by petitioner. Petitioner's argument in support of its contrary view is rather intricate and needs to be spelled out clearly. Petitioner argues that our decisions in Andrew Jergens Co., 40 B.T.A. 868 (1939) and U.S. Industrial Alcohol Co., 42 B.T.A. 1323 (1940) (Issue V), are to the effect "that a taxpayer can deduct payments made to cover expenses or charges of a property owner (separate entity) where the payments are required to obtain the use of the property in the taxpayer's business, albeit such expenses or charges are ordinarily deductible only by the property owner"; and that our decisions in Western Wine and Liquor Co., 18 T.C. 1090 (1952) and Charles A. Clark, 19 T.C. 48 (1952), following Western Wine, "stand for the proposition that a payment necessarily made as a part of a transaction of purchase of property is to be included in the cost of the property." The petitioner contends that "[in] the case at bar, the by-law payments to the subsidiary's employees were an integral part of the arrangement for the purchase of foreign leaf tobaccos from the subsidiary in that the petitioner was obliged to make them *267 in order to acquire these tobaccos." This complex argument is completed by reference to the decision in United States v. Joliet & C.R. Co., 315 U.S. 44 (1942) which petitioner interprets as holding, in terms of the instant case, that the by-law distribution payments in issue are no less an element of petitioner's cost of goods sold because they were made directly to the employees of the subsidiary, then they would have been had they been made to the subsidiary and then to the employees of the subsidiary. Petitioner's involved argument is built of several separate and severable principles which it gleans from various unrelated cases, and while it has an appearance of continuity and symmetry, we think it fails upon careful probing and examination of its parts. In Andrew Jergens the taxpayer, a parent company, granted the use of its plant and manufacturing facilities to two wholly-owned subsidiaries, and it was agreed that such subsidiaries would pay therefor an amount equal to their respective shares of the parent-taxpayer's overhead, including payments of salary and wages to the taxpayer's employees who engaged in the manufacture of the subsidiaries' products. The sole issue presented *268 to the Board was whether an amount equal to the share of petitioner's expenses for overhead, materials and labor allocated and charged to the two subsidiaries, constituted a part of the taxpayer's gross income for the year in accordance with the agreement of the subsidiaries to pay the taxpayer such amount for the use of the taxpayer's plant and facilities. The taxpayer was on an accrual basis and actual payment of the receivables from the subsidiaries was not necessary. The Board held that such amounts would constitute income to the taxpayer. It is clear, however, that the charges were contractual in nature, and that the obligation was based upon a valuable consideration. The circumstances differ materially from an essentially non-contractual payment made by a parent company to the employees of its subsidiary which was clearly a separate entity. Likewise, Industrial Alcohol involves a problem very different from the one before us and resulted in a rule which can have no application to the instant case. There the question concerned whether the taxpayer's affiliate, with whom the taxpayer had filed a consolidated return, might deduct certain amounts resulting from use by it of boats *269 belonging to a subsidiary of the affiliate. The Board indicated that such deduction would have been denied if it had been advanced on the theory that the deduction was for depreciation, since the property was not that of the taxpayer's affiliate, but of the affiliate's subsidiary. The claim, however, was allowed on the ground that the use of the boats resulted in a contract liability to pay an amount sufficient to cover the depreciation sustained by the owner and that the charges on the affiliate's books in such amount was tantamount to payment, since the affiliate was on an accrual basis, citing Andrew Jergens. The circumstances were very like those involved in the Jergens case where the issue was whether there was income to the lessor. In Industrial Alcohol the issue was whether the lessee was entitled to a deduction for an equivalent amount paid by it to the lessor as rent or compensation. The Board in Jergens had previously expressed its view with respect to this latter issue, as follows (p. 875): "[The subsidiaries] did not pay any taxes, suffer any depreciation, or expend any amounts for repairs. They were not owners of the property. The amounts charged to them by the petitioner *270 were deductible by them on some other basis. Those amounts represented expenses of their business. They were either wholly, or partly, rent, and if not entirely rent, they were expenses paid out as compensation for services rendered by the petitioner. Similar expenditures were held to be deductible as rent in the case of Denholm & McKay Co., 39 B.T.A. 767. See also Charles R. Holden, 27 B.T.A. 530, where somewhat similar items were held to be rent even though the contract stated that they were not rent. * * *" See also, Atlantic Monthly Co., 5 T.C. 1025 (1945). It is clear, we think, that neither Jergens nor Industrial Alcohol involved a situation similar to the one before us, where the petitioner has simply paid additional salary to the employees of a separate entity by its own act and without contractual or other legal obligation. The instant case is not one where the employees were petitioner's and were paid by the petitioner but were being used by a subsidiary, in return for which use the petitioner was to receive and the subsidiary was to pay an equivalent amount as rent or compensation. The second step in petitioner's argument also involves some unwarranted refinement of the *271 rule of Western Wine and Clark, each of which involved completely different circumstances and presented different problems. In Western Wine the taxpayer had bought capital stock of a distilling company in order to acquire whiskey which was then in scarce supply. In addition to the cost of the stock, it paid an amount of cash for the whiskey goods purchased. We held that the purchase of the stock and whiskey were integral parts of a single transaction and that the cost basis to the tax payer of the whiskey would include a loss sustained by the taxpayer upon a subsequent sale of the stock sometime shortly after acquisition. (The situation in the Clark case is essentially the same as that in Western Wine from point of view of principle and it is unnecessary to detail the facts.) Petitioner argues that Western Wine stands for the proposition that any payment necessarily made as a part of a transaction involving the purchase of property is to be included in the cost of the property. We think that such statement is much too broad an interpretation of our holding in Western Wine which not only differs from the instant case on the facts, but nowhere supports or even suggests the view that *272 essentially non-contractual payments by the petitioner of additional amounts of compensation to a few selected employees of its subsidiary are properly a deductible cost to petitioner as a part of the cost basis of the goods purchased. The subsidiary here undertook no obligation to make such additional payments and petitioner's choice in the manner of its operation must necessarily guide us in determining the tax effects thereof. Petitioner's last point likewise fails to withstand close scrutiny. In the Joliet case it was held that a lessee's payments of dividends on the stock of its lessor directly to the lessor's stockholders constituted income to the lessor. Petitioner argues that by the same token its payments directly to the employees of the subsidiary constituted a part of its cost of goods sold. The Court in Joliet, however, was concerned only with a question of income to the lessor, under circumstances in which the payments made were by contract supported by a valuable consideration. The fact that the payments were made direct to the stockholders was merely a matter of convenience. Thus, the problem was very much the same as that in Andrew Jergens, since the dividend payments *273 by the lessee were clearly a part of the lessee's rental expenses which should have inured to the benefit of the lessor. Consequently, under the doctrine of Lucas v. Earl, 281 U.S. 111 (1930), such amounts were necessarily to be taken into income by the owner (lessor) although the amounts were paid directly to another. Petitioner offers no principle upon which we might rule in its favor with respect to this issue and cities no cases in point. Our research reveals none which favor the petitioner, but rather reveals an authority to the contrary. In Great Island Holding Corporation, 5 T.C. 150 (1945), petitioner and several other corporations had common officers and to some extent common employees. The petitioner paid all such persons their compensation. Respondent disallowed a very large part of amounts deducted by petitioner for salary payments. We restored such amounts as proper deductions except to the extent that the salaries were paid, not for services rendered to the petitioner, but for services rendered to the related corporations. We think our holding therein was proper and reflects the principle which is here applicable. Petitioner, therefore, is not entitled to deduct any *274 portion of the by-law distribution payments made by it to the employees of Glenn, which payments, to whatever extent they might be considered as compensatory in nature, were for services rendered by such employees to Glenn and not to the petitioner. Decision will be entered under Rule 50. Footnotes
*. Obviously, this number should read 2,346,799.95.↩
1. Includes 20 Glenn Tobacco Company employees.↩
1. The total shown is for only officers and directors who were in the employ of the petitioner on December 31, 1949. The total for all fixed salaries and additional compensation paid to officers and directors for the year 1949 is greater by $16,667, and is explained by the fact that S. Clay Williams, former chairman of the board, died in February 1949 and received his fixed salary for two months, but did not receive any participation under the by-law. Such difference reflects two months' salary of Williams at the rate of $100,000 a year.↩
1. The record does not indicate the number of officers and directors of the above three companies for 1949 and 1950. Beginning with the year 1949, the regulations of the Securities and Exchange Commission discontinued the requirement that the number of officers and directors be shown, but required the listing by name of all officers and directors who received more than $25,000 per annum in total compensation and the total compensation paid to all officers and directors, including those not listed. However, for American, on their Form 10-K for 1949, 17 officers and directors are shown who received total salaries of $918,500, whereas the total salaries shown for all directors and officers was $936,500, a difference of $18,000 which was paid to one or more additional officers or directors. On American's Form 10-K for 1950, 17 officers and directors are shown who received total salaries of $934,000.08, whereas the total salaries shown for all directors and officers was $952,000.08, a difference of $18,000 which was paid to one or more additional officers or directors. All of the bonuses paid by American to officers and directors are included opposite the names of directors specifically listed on Form 10-K. The record, in Form 10-K filed by Liggett for 1949, shows a total of 12 officers and directors whose total salaries and bonuses equal the same total salaries and bonuses shown as having been paid to all officers and directors, indicating that the total number of officers and directors of Liggett for 1949 was 12. On Liggett's Form 10-K for 1950, 11 officers and directors are shown who received total salaries and bonuses of $936,602.94, whereas the total salaries and bonuses shown for all officers and directors was $961,102.94, a difference of $24,500 which was paid to one or more additional officers and directors. The record, in Form 10-K filed by Lorillard for 1949, shows a total of 10 officers and directors whose total salaries and bonuses were $533,915.42, whereas the total salaries and bonuses shown for all officers and directors was $627,015.42, a difference of $93,100, which was paid to one or more additional officers or directors. On Lorillard's Form 10-K for 1950, nine officers and directors are shown who received total salaries and bonuses of $495,479.80, whereas the total salaries and bonuses shown for all officers and directors was $611,010.67, a difference of $115,530.87, which was paid to one or more additional directors or officers.
1. The figure in parentheses immediately following each amount is the number of other individuals who also received such amount.↩
1. The figure in parentheses immediately following each excess amount is the number of individuals who received such amount.↩
2. E. G. Charles E. Sorenson, 22 T.C. 321 (1954) (stock option); Dean Babbitt, 23 T.C. 850 (1955) (stock option); Indianapolis Glove Co. v. United States, (C.A. 7, 1938) 96 Fed. (2d) 816 (stock purchase); Alger-Sullivan Lumber Co. v. Commissioner, ( C.A. 5, 1932) 57 Fed. (2d) 3 (stock purchase); Electric Storage Battery Co., 39 B.T.A. 121 (1939)(stock purchase); United States Steel Corp., 2 T.C. 430 (1943) (stock purchase); Package Machinery Co., 28 B.T.A. 980 (1933) (profitsharing stock bonus); Dempster Mill Mfg. Co., 12 B.T.A. 1273 (1928) remanded on a different point (C.A.D.C., 1931) 46 Fed. (2d) 604 (stock bonus). See also Norman G. Nicolson, 13 T.C. 690↩ (1949).
3. Lincoln Electric Co., 6 T.C. 37 (1946), reversed and remanded (C.A. 6, 1947) 162 Fed. (2d) 379, considered upon remand by the Court in a Memorandum Opinion [6 TCM 1218,], reversed and remanded (C.A. 6, 1949) 176 Fed. (2d) 815, and again considered on remand by this Court in 17 T.C. 1600↩ (1952).